## BETHOLD B. VINCENT *et al.*

*v.*

## THE CHICAGO AND ALTON RAILROAD COMPANY.

| 49 | 33 |
| 27a | 409 |
| 49 | 33 |
| 129 | 285 |
| 49 | 33 |
| 50a | 353 |
| 49 | 33 |
| 80a | 457 |

| 49 | 33 |
| 108a¹⁰ | 507 |
| 108a¹¹ | 508 |

1. RAILROAD COMPANIES—*required to deliver the goods to the consignee—at his place of business—when on the line of its track.* Under section 22 of the act of February, 1867, entitled "Warehousemen," railroad companies are positively inhibited from making delivery of any grain which they have received for transportation, into any warehouse other than that into which it is consigned, without the consent of the owner or consignee thereof.

2. SAME—*of the rule at common law.* And independent of the statute, the duty to make a personal delivery to the consignee, in cases where such delivery is practicable, is required by the common law.

3. SAME—*rule relaxed as to railroad companies.* And the common law rule, requiring common carriers by land to make personal delivery to the consignee, has been so far relaxed as regards railways, *from necessity,* as in most cases to substitute, in place of personal delivery, a delivery at the warehouse of the company. But this is upon the ground that a railway has no means of delivery beyond its own lines.

5—49TH ILL.

4. Same—*cases where personal delivery is required.* And in cases where a shipment of grain is made to a party having his warehouse on the line of the road by which the grain is transported, and such consignee is ready to receive it, it is the duty of the carrier to make a personal delivery to him, at the warehouse to which it is consigned.

5. In cases of this character, the rule of the common law must be applied in its full force, the *necessity* not arising for its relaxation.

6. Same—*what points are to be considered as on the line of a railway for the purposes of personal delivery.* Where the owner of adjacent property to a railway company had, with the consent of the company, for a valid consideration, been permitted to lay down a side track, connecting with the track of the company, for the purpose of transporting to such property articles of freight, and such owner has erected thereon a warehouse, which is in readiness for the receipt of such freight, such side track is to be considered as a part of· the line of the company, for the purposes of delivery under this statute.

7. Same—*in what cases only—the company will be excused from delivery.* In such cases, a personal delivery must be made at a warehouse on the line of such side track, the same as if the warehouse stood upon a side track owned by the company, and the company have the right to send its cars over such track for the purposes of delivery, until forbidden by the owner, when it will be excused from delivery.

8. Chancery—*courts of will interfere to restrain.* And in such case, where the carrier refuses to make a personal delivery to the consignee, the party injured is not confined to the statutory redress; the right created not being a new one, nor the remedy provided adequate, he may resort to the restraining powers of a court of chancery, to prevent an injury to his business which might ensue, and which could not be compensated for at law. ·

9. Railroad companies—*as to discriminating charges.* A railroad company, although permitted to establish its rates of transportation, must do so without injurious discrimination as to individuals.

10. And when it has fixed its rates for the transportation of grain, from any given station, on the line of its road, to Chicago, it will not be permitted, on the grain being taken there, to charge one rate for delivery at the warehouse of one person, and a different rate for delivery at that of another, both warehouses being upon its line or side tracks.

11. Same—*delivery must be made to the warehouse to which the freight has been consigned.* And where the company takes grain consigned to Chicago, its duty is to deliver it in Chicago, at any warehouse, upon its lines or side tracks, to which it has been consigned.

Appeal from the Superior Court of Chicago.

The opinion states the case.

Mr. J. D. CATON, Messrs. WILLIAMS & THOMPSON and Mr. EMERY A. STORRS, for the appellants.

Messrs. WALKER & DEXTER, for the appellee.

Mr. JUSTICE LAWRENCE delivered the opinion of the Court:

This was a bill for an injunction, brought by the appellants, against the appellee. The defendant demurred to the bill. The motion for an injunction and the demurrer were heard at the same time. The demurrer was sustained and the bill dismissed, whereupon the complainants appealed.

The substance of the bill is briefly and correctly stated in one of the arguments for appellants, as follows:

"The complainants own and occupy a warehouse in the city of Chicago, known as the National Elevator, situated upon the line of the defendant's railroad, and connected with it by a side track about one hundred and fifty feet in length, and situated two blocks from the freight depot, and between that and the passenger depot. The warehouse is provided with all the ordinary machinery and conveniences for the handling of grain in bulk; and the owners had established, and, up to the time of the acts complained of in the bill, were conducting a large and profitable business as warehousemen. The greater part of the business of the complainants consisted in the storing and the transfer of grain which was transported over the defendant's road, and up to about the 1st day of May last, the defendant had delivered to the complainants all the grain consigned to them, without objection.

The side track connecting the defendant's road with the complainants' warehouse was constructed under the following circumstances: The grantors of the complainants then being

36    VINCENT *et al. v.* C. & A. R. R. Co.    [Sept. T.,

Opinion of the Court.

the owners of the lot upon which the warehouse is situated, and through which the road of the defendant passes, on the 18th of September, 1860, conveyed to the Pittsburg, Fort Wayne & Chicago Railway a strip of land through the lot, to be used by the railroad company as a right of way, the grant being subject to the following, among other, conditions: 'That said railroad company shall, when required, construct on and for the use of the owners of said lot two (2), in block seventy (70), free of charge, a side track and switches, in all respects equal to those used by the company.' This agreement was recorded, and the defendant had notice of the conditions. Subsequently the Pittsburg, Fort Wayne & Chicago Railway conveyed an undivided half of its right of way to the Joliet & Chicago Railroad, of which the defendant's railroad is the successor, and the right of way is now jointly owned and used by the Pittsburg, Fort Wayne & Chicago Railway and the defendant.

On or about May 6, 1868, the defendant began to refuse to deliver into the complainants' warehouse the grain consigned to it, although received by the defendant with proper directions as to its delivery, and to deliver all grain transported over its road into the warehouse of Munn & Scott, even when consigned by the shipper to the National Elevator; and on the 28th of April, 1868, the defendant issued the following notice:

> CHICAGO & ALTON RAILROAD,
> GENERAL FREIGHT AGENT'S OFFICE,
> CHICAGO, April 28th, 1868.

To AGENTS:

On and after May 11th, and until further notice, grain may be consigned to the National Elevator, Chicago, if shippers so order, at an additional charge of five dollars per car, for delivery of cars at elevator, on all grain so consigned. Agents will add five dollars per car to our charges on the way bill.

All unconsigned bulk grain will be delivered to the Union Elevator, as heretofore.  Please notify shippers.

T. B. BLACKSTONE,

*President and General Superintendent.*

JAMES SMITH, *General Freight Agent.*

After May 11th, and up to the time of filing the bill, the defendant has, in some instances, refused to deliver to the complainants the grain consigned to them, and this absolutely and irrespective of charges, and in other cases has refused to deliver them grain, except upon the payment by the shipper of five dollars per car, in addition to the regular charges for freight.

It is alleged in the bill, that the complainants' warehouse is as conveniently situated, with reference to the delivery of cars into it, as any of the elevators or other private business places in the city; that it is the uniform custom for railroads to deliver freight into such places free of charge; and if such delivery is a proper subject of charge, that five dollars per car is excessive and extortionate, and wholly disproportionate to the service rendered.  It is also alleged, that the acts of the defendant cause an irreparable injury to the complainants, and that the defendant threatens to continue them.  The bill concludes with a prayer that the defendant be restrained from delivering cars of grain, consigned to the complainants, to the warehouse of Munn & Scott, or any other place except as consigned; and also from imposing the charge of five dollars per car for delivery at elevator, or any other excessive charge."

The demurrer admits the statements of the bill to be true.

It will be seen, from the foregoing abstract of the bill, that the questions presented by this record in brief are, whether the appellants have a legal right to insist upon a delivery, at their elevator or warehouse, of grain consigned to them,

without discriminating charges against them, such warehouse being connected with the line of the railway in the manner above stated, and, if they have such right, whether the powers of a court of chancery can be invoked to protect it.

The rule of the common law, requiring common carriers by land to deliver to the consignee, has been so far relaxed in regard to railways, from necessity, as, in most cases, to substitute, in place of personal delivery, a delivery at the warehouse or depot provided by the companies for the storage of goods. It has repeatedly been held by this court, that a railway company may discharge itself of its liability, as a common carrier, by safely depositing goods in its warehouse, and there holding them, under the responsibilities of a warehouseman, until demanded by the consignee. These decisions proceed upon the ground that a railway has no means of delivery beyond its own lines. But the question presented by this record is of a different character.

There are some facts connected with the vast internal commerce of this State, of which, independent of any averments in the bill, we will take judicial notice. The immense quantities of grain which are annually transported to Chicago over our lines of railways, making that city, with the aid of contributions from neighboring States, one of the great grain markets of the world, are chiefly sent in bulk. The grain is ordinarily consigned to commission merchants who have erected vast warehouses, termed elevators, connected by side tracks with the main line of some railway, and provided with machinery for the rapid unloading of the cars, and storage of the grain. As the grain is of various grades and prices, it is of great importance to the agricultural and mercantile interests of the State that each shipment of grain should be stored by itself, or with grain of the same grade, and that every shipper should be able to select his own consignee, with the certainty that, if his elevator is on the line of the road by which the grain is transported, and the consignee is ready to receive the

shipment, it shall be faithfully delivered to him.   This arrangement is as advantageous to the railways as it is to the consignor and consignee.   It would obviously be impossible for the companies to unload and store this grain at their ordinary freight depots, to be there held, unmixed with other grain, subject to the order of the consignees, without incurring great additional expense, and they would hardly claim the right, under their charters, to erect elevators of their own, for the purpose of adding the business of commission merchants to that of common carriers.   If they were to do so, the tendency of such a practice to create a dangerous monopoly, would probably soon arrest the attention of the legislature, and lead to its prohibition.

The custom of delivering grain at the elevators to which it is consigned, and which are connected with the line by convenient side tracks, has thus grown into one of the necessities of railway commerce, and the bill before us avers it is a custom from which no railway company has sought to depart, except the present appellee.

If, then, the common law rule requiring of common carriers an immediate delivery, when practicable, to the consignees, has been relaxed, in regard to railways, only from necessity, it is difficult to perceive why the rule should not be applied, in its full force, to transportation of this character.   Here the necessity of relaxation has not only ceased, but the railway is compelled to seek some other warehouse than its own freight depot, and to send its cars, over a side track, to some private elevator.   And where there are several elevators thus connected with the main line, in substantially the same mode, it is difficult to conceive how, as a question merely of common law, the railway company can be permitted to deliver grain to an elevator of its own selection, in place of that to which the property has been consigned.

The legislature, however, has made this matter a subject of legislation, and thereby placed this question beyond all

controversy. Section 22 of the act entitled "Warehouse-men," passed February 16, 1867, contains the following provision:

"It shall be unlawful for any railroad or railway company to deliver any grain into any warehouse other than that into which it is consigned, without the consent of the owner or consignee thereof; and it shall be the duty of said party or parties, at the time of shipment of said grain, or before it reaches its destination, to give notice to the railroad or railway company by card, on the car or otherwise, of the warehouse into which said grain is to be delivered; and for the failure to deliver the grain according to the direction of the owner or consignee thereof, such railroad or railway company shall be liable to the warehouseman to whom the same should have been delivered, for two months' storage of all such grain so consigned or refused, and also to such warehousemen, and to the owners of such grain, for all other damages either of them may have sustained by reason of such refusal or neglect of said railroad or railway company, including all lawful expenses incurred by him or them in the prosecution of any suit or suits against such railroad or railway company to recover the penalties, or enforce the provisions of this act." Laws of 1867, p. 181.

If, under the common law, there could be any doubt in regard to the duties of railway companies in cases of this character, this statute sets them at rest. So far, however, as concerns the duty to deliver to the warehouse to which the grain has been consigned, where such delivery is practicable, it is really but declaratory of the common law, and is new only in the additional remedies it gives to secure the performance of the obligation. As to what that obligation is, it certainly leaves no room for controversy.

It is urged, however, by the counsel for the company, that this act does not mean that railway corporations shall deliver grain at points off their line. Clearly it does not; but the question recurs, what points are to be considered as on the line of a railway for the purposes of delivery under this law? As to this, we differ from the counsel of appellee. They contend that its line consists only of its main track and such side tracks as belong to it. For most purposes this is undoubtedly true, but not in reference to their duties under this statute. A railway company can unquestionably refuse to allow the owner of adjacent property to lay down a side track connecting with its own rails, but when, for a valid consideration, it has once conceded that right, and, as in the case before us, has permitted the connection to be made, and the side track to be laid, for the use of a particular lot of ground, and in order to transport to such lot heavy articles of freight, and the owner of such lot and side track has his warehouse in readiness for the receipt of such freight, then, we say, that such side track is to be considered as a part of its line for the purposes of delivery under this statute. There is no reason why it should not be so regarded as much as if the elevator stood upon a side track belonging to the railway itself. What difference does it make to the company who owns the ground, or who has laid the rails? Can it not deliver a car load of wheat with the same convenience whether the side track belongs to itself or to some other person with whom it has bargained the track may be laid? And when we thus speak of equality of convenience, we are to bear in mind that railways have been excused from delivery to consignees only on the ground of impossibility, and not as a matter of convenience. Counsel say the company has no right upon such a side track except by permission of the owner. As well might it be said that a common carrier by wagon had no right to drive through the gateway of the consignee for the purpose of delivering goods, and he was therefore to be excused for

6—49th Ill.

non-delivery. After the track has been laid for the purpose of receiving freight, the company has a right to send its cars there for the purpose of delivery, until forbidden by the owner. When that is done, the company will be excused from delivery.

There is no pretence for saying the legislature, in enacting this statute, had in view only grain warehouses erected upon the land of the railway companies. If there be such warehouses in Chicago, they would stand in little need of an act of the legislature for their protection. The legislature had its eyes turned in the opposite direction. Its evident object was to prevent the growth of those injurious monopolies in the grain trade, which would almost necessarily spring from the toleration of such a practice as that which these appellants seek to enjoin. To do this, it was necessary to secure to every warehouseman, whose warehouse was connected by a side track with a railway, the right to a delivery of all grain consigned to him.

What we have said sufficiently disposes of the point made by counsel as to the constitutionality of the act of the legislature. It may be conceded that a railway company can not be required, by legislative enactment, to transport freight beyond its own line, but that this act is valid, as to warehouses upon the line, is not denied by counsel, and such we hold the warehouse of appellants to be.

Neither is it necessary to consider the import of the contract between the appellants and the Pittsburg, Fort Wayne & Chicago Railway, or how far it is binding on the appellee as a remote grantee. It is sufficient that the appellants' elevator is connected with the main line by a side track, and that the connection was made for a valuable consideration with the consent of the company then owning the road. It is not pretended that the appellee has a right to destroy it, in order to excuse itself from the performance of a duty.

But it is contended, finally, that even admitting the complainants have been wronged by the appellee, their only remedy is by action for the two months' storage and damages authorized by the statute. Various authorities are cited for the purpose of showing that where a new right has been created, and an adequate remedy for its invasion provided by the same statute, parties injured are confined to the statutory redress. This is doubtless true; but in this case the right is not new, nor is the remedy adequate. A new and enlarged remedy is given, but the right of the consignee to delivery is as old as the common law. The right, in this case, to resort to the restraining powers of a court of chancery, springs from the fact that the course pursued by the company will destroy or greatly injure the business of the appellants. This is evident, for if the tax of five dollars per car is charged by them to their correspondents, they would soon cease to receive shipments of grain, and if paid by themselves, they would be placed at a ruinous disadvantage in comparison with their rivals in business. For such injuries the damages in a suit at law could furnish no just compensation, and therefore chancery will interfere. *Webber* v. *Gage*, 39 N. H. 182, and *Watson* v. *Sunderland*, 5 Wallace, 74, are authorities in point. A system of jurisprudence would be radically defective that could not interpose to prevent wrongs of this character, incapable, from their nature, of being redressed by damages.

As to the right of the company to impose the extra charge of five dollars, on the ground that it is performing additional service, it need only be said that a railway company, although permitted to establish its rates of transportation, must do so without injurious discrimination as to individuals. It must deal fairly by the public, and this it would not be doing if allowed so to discriminate as to build up the business of one person to the injury of another in the same trade. It may fix its rate of charges for transporting a bushel of grain from any given station upon its line to Chicago, but, the grain being

. taken there, it can not charge one rate for delivering it at the elevator of Munn & Scott, and another for delivering it at that of appellants.   When it takes grain consigned to Chicago, its duty is to deliver it in Chicago, at any warehouse upon its line or side tracks to which it has been consigned.   The object of the legislature, in passing the statute upon which we have commented, would be utterly defeated, if the companies were left at liberty to discriminate at their discretion in their charges for delivery at different warehouses.   That is as much prohibited by the spirit of the law, as is the actual delivery to any other person than the consignee by its letter.

As to the general equity of the bill, it is hardly necessary to remark.   It is to be hoped that when the answer comes in, and the evidence is heard, some explanation may be given by the defendant of its course.   For the present, we must accept the bill as true.   As the record now stands, the company seems to be using its vast powers, as a corporation, with a view to create a practical monopoly for a favored house, in dealing with all the grain that must necessarily come over its lines from the long tract of country that it traverses, thus ruining the business of the appellants, and inaugurating a policy which, if once established, would place the farmers of the State under grievous tribute; and all this in defiance of an act of the legislature so plain that he who runs may read. The act in question is an eminently wise and salutary law, and the courts should use all their legitimate powers to guard it against either open disobedience or covert evasion.

The decree of the superior court is reversed and the cause remanded.   That court will award a temporary injunction, restraining the defendant from delivering to any other place or warehouse than that of complainants any grain consigned to their warehouse, or from imposing upon them an additional charge for such delivery, beyond what is imposed upon other warehousemen, taking from the complainants bond with approved security, conditioned in the usual manner, and if,

upon a final hearing, the case made by the bill is sustained, the court will make such injunction perpetual.

*Decree reversed.*