# CASES

IN THE

# SUPREME COURT OF ILLINOIS.

## CENTRAL GRAND DIVISION.

JANUARY TERM, 1873.

---

## THE CHICAGO AND ALTON RAILROAD COMPANY

### *v.*

## THE PEOPLE *ex rel.* GUSTAVUS KOERNER *et al.* COMRS.

1. COMMON CARRIERS—*railroad corporations, subject to the laws governing.* A railroad company is chartered, and is chartered solely, for the purpose of exercising the functions and performing the duties of a common carrier. The grant in its charter is clearly nothing more than that the corporation shall have the same right of establishing tolls that a natural person has when acting as a common carrier,—a right to be exercised within the same limitations that the common law, in behalf of justice and public policy, imposes upon the natural man.

2. SAME—*implied limitations upon charter powers of railroad corporations—unreasonable rates and unjust discriminations.* The rule forbidding unreasonable charges and unjust discriminations, being a common law rule, railroad companies, by accepting their charters, take them with this implied limitation upon the power granted in general terms, to establish their rates of freight. Such charters are granted for the purpose of furnishing improved means of transportation and travel to all persons alike, without unjust discrimination between individuals or communities, and

when accepted it is with the knowledge that the nature of the grant imposes these obligations.

3. CONSTITUTIONAL LAW—*legislative control over railroad corporations.* Even conceding that the charters of railroad companies are contracts, the constitutional power of the legislature to prohibit unjust discrimination in freights still exists, and rests in the right of the legislature to prescribe the methods by which to enforce a common law duty that such companies voluntarily assume when they exercise the functions of a common carrier. Such legislation is in no respect a violation of their charters.

4. RAILROADS—*what is unjust discrimination.* The establishment permanently of less rates of freight at points of competition with other roads than is fixed at other places for the same distance, can not be justified by showing that the rates charged at such other places are reasonably low, and that the rates charged at competing points are unreasonably low. Even if the higher rates are reasonably low, when regarded with reference to the profit upon the capital invested in the road, they are not reasonable in the true sense of the term, if no satisfactory reason can be given for charging less rates for the same or greater services to persons at other stations. Such corporations should not use their power to benefit particular individuals or build up particular localities by arbitrary discriminations in their favor that must cause injury to other persons or places engaged in rival pursuits, or occupying rival positions.

5. SAME—*constitutional provision as to discriminations.* Sec. 15, art. 11, of the new constitution, which provides that "the general assembly shall pass laws to correct abuses and prevent *unjust* discrimination and extortion in the rates of freight and passenger tariffs on the different roads," etc., is a recognition of the fact that there may be discriminations which are not unjust, and by implication it restrains the power of the legislature to a prohibition of those which are unjust.

6. CONSTITUTIONAL LAW—*law making a certain act that may be innocent, conclusive evidence of guilt.* An act of the legislature which forbids any discriminations whatever, under any circumstances, whether just or unjust, in charges for transporting the same class of freight over equal distances, even though moving in opposite directions, and does not permit the companies to show that the discrimination is not unjust, but infers guilt as a conclusive presumption from the mere fact of a difference of rates, without any opportunity of rebutting such presumption, is in violation of the spirit, if not the letter, of the constitutional provisions for the protection of life, liberty and property, and which guarantees the right of trial by jury, and which gives the right in all criminal prosecutions to appear and defend in person and by counsel.

7. The legislature can not raise a conclusive presumption of guilt against a natural person from an act that may be innocent in itself, and

thereby take from him the privilege of showing the actual innocence or propriety of the act, and confiscate his property as a penalty for the supposed offense.

8. SAME—*excessive penalty.* An act of the legislature making any discrimination on the part of railroad companies in their charges for freight a penal offense, and providing for a forfeiture of all their franchises for any wilful violation of the act, without any other penalty for the first offense, is in violation of the spirit of the constitutional provision which requires all penalties to be proportioned to the nature of the offense, and also of sec. 15 of art. 11, under which such a law is framed, which only authorizes the penalty to extend to forfeiture of franchises and property "*when necessary for that purpose.*"

9. SAME—*what legislation, in respect to railroad discriminations, would be proper and constitutional.* An act prohibiting railroad companies from making any *unjust* discriminations in their charges for transporting freights, making the charging of a greater compensation for a less distance or for the same distance merely *prima facie* evidence of unjust discrimination, instead of conclusive evidence, and giving such companies the right of trial by jury, not only of the fact of discrimination, but also upon the issue whether such discrimination is just or not, is within the unquestionable power of the legislature and would be subject to no constitutional objection.

10. STATUTES—*when strictly construed.* A law admitting of but one penalty, and that of the harshest possible character, will be subjected by the courts to close criticism and to a strict construction.

APPEAL from the Circuit Court of McLean county; the Hon. THOMAS F. TIPTON, Judge, presiding.

This was an information in the nature of a *quo warranto* on the relation of Gustavus Koerner, Richard P. Morgan, Jr., and David S. Hammond, railroad and warehouse commissioners, against the Chicago and Alton Railroad Company, to have a forfeiture of its franchises declared for the reasons given in the opinion of the court. The court below rendered judgment of *ouster* against the company, from which this appeal was taken.

Messrs. BECKWITH, AYER & KALES, and Messrs. WILLIAMS & BURR, for the appellant.

Mr. J. H. ROWELL, Mr. HAMILTON SPENCER, and Mr. R. M. BENJAMIN, for the relators.

Mr. CHIEF JUSTICE LAWRENCE delivered the opinion of the Court:

This record brings before us the proceedings upon an information in the nature of a *quo warranto,* filed by the railroad commissioners of the State against the Chicago and Alton Railroad Company, under the act which went into operation July 1, 1871, entitled "An act to prevent unjust discriminations and extortions in the rates to be charged by the different railroads in this State for the transportation of freight on said roads." The information set forth that the company, in violation of this act, had repeatedly charged and received for transporting lumber from Chicago to Lexington, a distance of one hundred and ten miles, the sum of five dollars and sixty-five cents per one thousand feet, while, at the same time, it had only charged for transportation of like lumber from Chicago to Bloomington, a distance of one hundred and twenty-six miles, the sum of five dollars per one thousand feet. The company, by way of defense, pleaded its charter and alleged that the rates of toll from Chicago to Lexington were in fact reasonable, while the rates from Chicago to Bloomington were unreasonably low, and were established because of the competition at the latter point with the Illinois Central Railroad Company. To this plea the relators demurred. The demurrer was sustained, a judgment of ouster was pronounced against the company, and its franchise was declared forfeited. From this judgment the company has prosecuted an appeal to this court.

The question involved in this record is the constitutionality of the act of the legislature under which the information was filed. The object of the general assembly in passing the law is indicated by its title, which we have already given. The substance of the first section of the act is, that no railroad corporation in this State shall charge a larger compensation for the transportation of freight over any distance than it is charging at the same time, for freight of the same class,

over a less distance, nor shall it charge the same amount that it charges over a less distance.   Another clause of the same section provides, that no railroad company in this State shall charge a larger compensation for freight over any portion of its road, than is charged for freight of the same class over any other portion of equal length.

The second section of the act merely defines what is meant by the phrase " railroad corporation."

The third section makes the rates of the year 1870 the standard for freight charges.   This section is not brought before us by this record.

The fourth section provides for the recovery of a penalty of one thousand dollars, in an action of debt, together with a reasonable attorney's fee, by any person aggrieved by the violation of this act.

The fifth and last section provides, that any wilful violation of this act, by any railroad corporation, "shall be deemed and taken a forfeiture of its franchises," and authorizes a proceeding to that end, such as is before us in the present record.

Very elaborate arguments have been filed by counsel, but they are chiefly devoted to a discussion of the power of the legislature to control the rate of railway charges or to fix their maximum limit.   It is urged by counsel for the company that its charter is a contract with the State, by which the latter has irrevocably granted to the corporation the right to establish its rates of toll, subject only to an implied condition, which is admitted by counsel, that they shall not be unreasonable or excessive.   It is further urged that this charter, with all the privileges it granted, is protected under that clause of the constitution of the United States which prohibits the States from enacting any law impairing the obligation of contracts.   On the other hand, it is contended by counsel for the relators that railroad corporations, which obtain their right of way through the exercise of the right of eminent domain—a right belonging only to the sovereign

power of the State, and to be delegated by that power only for public purposes—must be regarded as *quasi* public corporations, and therefore subject to legislative control, so far as may be necessary for the public welfare, of which the legislature must necessarily be the judge. It is further contended that the right to control and regulate their tolls is a species of police power which the legislature can not alienate from the State even if it should so desire, because essential to the proper sovereignty of the State.

These propositions of counsel invite us to a wide field of discussion, upon which we do not at present propose to enter. We have stated them for the purpose of saying, in terms, that we express no opinion in regard to them, and do not propose to do so until a case shall come before us demanding their discussion. There are laws upon our statute book involving their consideration, but the act before us does not necessarily do so in its application to the present case, and the expression of an opinion in regard to legislation not involved in this record would be obviously improper.

Conceding, for the purposes of this appeal, all that is claimed by counsel for the appellant in regard to the inviolability of railroad charters regarded in the light of contracts, we are still of opinion that the legislature has the clearest right to pass an act for the purpose of preventing an unjust discrimination in railway freights, whether as between individuals or communities, and to enforce its observance by appropriate penalties. The grounds of this opinion may be briefly stated, and they are as follows:

A railroad company is chartered, and is chartered solely, for the purpose of exercising the functions and performing the duties of a common carrier. The duties and liabilities of common carriers are clearly defined by the common law, and have been so defined for centuries. In all commercial countries the law upon this subject is one of the most important branches of legal science, and its leading principles were established by the courts of England at an early day. One of

these principles is, that nothing excuses the carrier for the
non-delivery of the goods received by him for carriage, ex-
cept the act of God, or the public enemy.   We do not find it
written in the charters of railroad corporations in this State,
that they shall exercise their franchises subject to this strin-
gent liability; yet, nevertheless, this court has firmly held
them to it, not permitting them to evade it, even by a notice,
or by any means short of a special contract with the shipper
to which his free assent must be shown to have been given.
Another perfectly well settled rule of the common law in
regard to common carriers is, that they shall not exercise
any unjust and injurious discrimination between individ-
uals in their rates of toll.   In the language of Chief Jus-
tice HOLT, when delivering the opinion of the court of
King's Bench, in the celebrated case of *Coggs* v. *Bernard,*
2 Lord RAYMOND, decided in 1703, the common carrier "ex-
ercises a public employment," and it necessarily follows
that he must deal with the public fairly and without un-
just discrimination.   This common law duty of common
carriers is not prescribed in the charters of railroad cor-
porations, but, like the other duty of delivering goods in
safety, unless prevented by the act of God or the public en-
emy, it attaches to them by virtue of their function as com-
mon carriers, the moment they commence the transportation
of freight.   In accepting their charters, which gave them an
artificial existence as common carriers, they necessarily ac-
cepted them with all the duties and liabilities attached, by the
existing law, to the function of a common carrier.   This
proposition seems to our mind so plain as hardly to admit of
more argument than an axiom in mathematics.   While the
law now imposes, and always has imposed, upon individuals
exercising the vocation of a common carrier, the obligation of
rendering service to all persons without injustice to any, how
utterly unreasonable it is to claim that a corporation is to be
permitted to discriminate in its tolls at its own discretion
and without regard to justice, merely because the legislature

in the charter that created it for the purpose of exercising a like vocation, has authorized it to establish rates of toll without, in terms, providing that they shall be free from unjust discrimination. What was the import of that grant, made, as it was, in broad and general terms? Clearly nothing more than that the corporation should have the same right of establishing tolls that a natural person has, when acting as a common carrier—a right to be exercised within the same limitations that the common law, in behalf of justice and public policy, imposes upon the natural man.

This case has been argued on both sides with commendable ability and candor, and we avail ourselves of an admission made by counsel for the company to illustrate the position we are enforcing. It is conceded by counsel, in express terms, that "a natural person is not allowed to make unreasonable and excessive charges as a common carrier, and an artificial person is subject to the same restrictions." It is, of course, contended by counsel, that the legislature has no power to determine what charges are reasonable or unreasonable, but with that branch of the question we have, in this case, no concern. It is undoubtedly true, as conceded by counsel, that the artificial person has no more right than the natural person to make unreasonable and excessive charges as a common carrier. And why? This restriction is not found in railway charters as generally framed, and certainly not in the charter presented by this record, in regard to which counsel are speaking. The obvious reason is, the principle we have already stated. The rule forbidding unreasonable charges was a common law rule when these charters were granted, and the companies accepted their charters with this implied limitation upon the power granted, in general terms, to establish their rates of freight. If this implied condition against unreasonable rates of freight attached by the existing law to their charters at the date of their acceptance, on what ground can it be held that the corresponding condition against unjust discrimination did not equally attach? There is no ground

for the distinction.   The charters were granted for the purpose of furnishing  improved means of  transportation and travel to all persons alike, without unjust  discrimination between  individuals or  communities,  and they were accepted with the knowledge that the nature of the grant imposed that obligation.

This  question of unjust discrimination is not  before this court for the first time.   In the case of *Vincent* against this same company, 49 Ill. 33, we held  that railway companies can  make no  injurious  discrimination between  individuals, and  therefore could not  charge one rate for delivering grain at a certain elevator in Chicago, and a higher rate for delivering at another  elevator in the same city, and equally accessible upon its  line.   The same rule was recognized in *The People* v. *C. and A. R. R. Co.* 55 Ill. 111, though the facts of that case were found not to require its application.   The rule was again declared  in  *C. and N. W. R. R. Co.* v. *The People ex rel. Hempstead et al.* 56 Ill. 365.   The opinion in that case cites several English and American cases in which it was held that railway companies could not be permitted to practice an injurious and arbitrary discrimination  between different persons, and we now refer to them without further citation.

If, then, an unjust discrimination is not to be permitted as between individuals in regard to freights, is it any more permissible as between different communities or localities?   We are wholly at a loss to discover the slightest difference in reason or  principle.   If a farmer, living  three  miles from the Springfield station upon this company's road, is charged fifteen cents per bushel for  shipping his corn to Chicago, is it just that the farmer who lives twenty miles nearer Chicago should be  charged a higher sum?   Certainly not, unless the  railway company can  show a  peculiar  state of  affairs to justify the discrimination, and this must be something  more than the mere fact that there are competing lines at one point and not at the other.   The discrimination, in such a case, is as much a discrimination between individuals as it would be in reference

to two persons living in the same locality, and shipping at the same station, unless, as before stated, a satisfactory reason can be given for discrimination between the points of shipment, and such a reason, in the case supposed, it is not very easy to conceive.

So, too, in the case before us. The resident of Bloomington, who sends to Chicago for a car of lumber, is charged by the company at the rate of five dollars per thousand feet for transportation. The resident of Lexington, who orders the same lumber at the same time, is charged five dollars and sixty-five cents per thousand feet for a transportation sixteen miles less in distance. Is there not here, unless an explanation can be furnished by the company, an unjust discrimination between individuals, quite as much within the prohibition of the principles of the common law as would be an unjust discrimination between individuals of the same town?

We have endeavored to show on what a firm foundation rests the constitutional power of the legislature to prohibit unjust discrimination in railway freights, even conceding what is claimed for their charters as contracts.

We should, however, be doing the counsel for appellant an injustice, if it were to be inferred from what we have said, that they distinctly assert a right, on the part of the company, to make unjust discriminations. We understand them to concede, in the conclusion of their argument, the power of the legislature to prohibit such discriminations, but they insist that no discrimination is unjust if the person against whom it is made is not himself charged an unreasonable rate. They therefore averred, in their plea to the information, that the charges for freight to Lexington were, in fact, reasonable, and those to Bloomington were unreasonably low. But in our opinion, if the act of the legislature had directed its penalties, as it should have done, not against all discriminations, but only against unjust discriminations, and had made *that* the issue to be tried, it would have been no answer to aver, in the plea, that the larger rates for the less distance were

reasonable rates.   That would have had only an argumentative bearing upon the issue to be tried, to-wit: the existence of an unjust discrimination between neighboring towns. What is a reasonable rate of freight over a railroad, is, at best, a mere matter of opinion, depending on a great variety of complicated facts, which but few persons could intelligently investigate, and which it would be wholly in the power of the company to furnish or withhold.   Railroad experts might be produced who would testify that, in their opinion, the rate to Lexington, in the present case, was a reasonable rate, but the fact that a less rate was charged for the greater distance to Bloomington, if the difference was a permanently established and not a casual difference, and if it could be explained only by the fact that there was a competing line at one place and not at the other, might be well accepted as conclusive proof that the rate to Lexington was not a reasonable rate.   The only issue to be made under a law properly framed, would be, whether there was an unjust discrimination or not. If, on the trial of such an issue, the prosecutor proves a permanently established discrimination, like that disclosed by the present record, and the company can show no other reason for it than the existence of a competing line at the favored point, the defense must be held unsatisfactory, notwithstanding witnesses may testify that they believe, as a matter of theoretical opinion, that the rates to Lexington are reasonable. They can not be reasonable, and the discrimination must be unjust, if the lesser rates for the greater distance have been established merely because the company has ceased to exercise at that point a practical monopoly.   It can not be supposed that either of the competing lines would establish a permanent rate of charges upon a scale that would not furnish a remunerative profit.   The rates to Bloomington would be established under the influence of a fair competition, which, by the ordinary laws that govern commerce, might be relied upon as establishing a rate not unreasonably low.   At Lexington, the rates would be established by the uncontrolled

discretion of the company, and it should not cause surprise if they were fixed unreasonably high. If the rates are not unreasonably low at Bloomington, they are unreasonably high at Lexington. If they are unreasonably low at Bloomington and at all other points touched by competing lines, is it not certain that the company will indemnify itself by charging, at the stations where there is no competition, a rate unreasonably high? And will not a discrimination arising solely from such a cause, be necessarily an unjust and injurious discrimination as to all persons shipping or receiving freights at the non-competing stations? If Lexington is a town where a considerable business is done, it is evident that this discrimination of rates, if permanently established, will diminish its business and check its growth. It was never intended or expected that these corporations should use their power to benefit particular individuals or build up particular localities by arbitrary discriminations in their favor that must cause injury to other persons or places engaged in rival pursuits or occupying rival positions. It is in vain to say, in defense of such discriminations, made without just cause, that the rate of charges against the injured person or locality is a reasonable rate and therefore no injury is done. An injury, as a matter of fact, is committed in the manner just suggested, and the legislature has the right to require the corporation to show a sufficient cause for the discrimination which produces the injury, and it can not be permitted to evade the issue by raising the speculative inquiry as to whether the rates charged against the injured parties or localities are not, after all, reasonable rates. Even if reasonable, when regarded in reference to the profit upon the capital invested in the road, they are not reasonable, in the true sense of the term, if no satisfactory reason can be given for charging less rates for the same or for greater services rendered to persons doing business with the company at neighboring stations.

From what we have said, it will be seen that the object of the law under which these proceedings were instituted, was,

in our opinion, clearly within the power of the legislature. The law was intended to prescribe the methods by which to enforce a common law duty that the railways of the State voluntarily assume wherever they exercise the functions of a common carrier, and it is, in no respect, a violation of their charters.

It remains to be considered whether there are defects in the details of the law which need to be amended, before it can be executed. We are of opinion that there are such defects, but they are susceptible of easy amendment.

The discrimination forbidden by the common law to common carriers, is an unjust or unreasonable discrimination. The provision in our new constitution is also against unjust discrimination. It is in the following words:

" The general assembly shall pass laws to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different roads in the State, and enforce such laws by adequate penalties, to the extent, if necessary for that purpose, of forfeiture of their property and franchises." Art. XI, sec. 15.

This provision, expressly directing the legislature to pass laws to prevent *unjust* discrimination, is a recognition of the palpable fact that there may be discriminations which are not unjust, and, by implication, it restrains the power of the legislature to a prohibition of those which are unjust. That was undoubtedly the object of the legislature in passing the existing law. This is clearly shown by its title. But the act itself goes further. It forbids any discrimination whatever, under any circumstances, and whether just or unjust, in the charges for transporting the same classes of freight over equal distances, even though moving in opposite directions, and does not permit the companies to show that the discrimination is not unjust. The mere proof of the discrimination makes out a case against the railway companies, which they are not allowed to meet by evidence showing the reason or propriety of the discrimination, and then, upon this sort of

*ex parte* trial, imposes, as a penalty for the offense, a forfeiture of the franchise, which would often be equivalent to a fine of millions of dollars. The object of the law is commendable, but such a proceeding, to be followed by such a penalty for the first offense, can not be sustained. It could only have been authorized through the inadvertence of the legislature. The law, as it now stands, makes an offense out of an act which might be shown not to be an offense, but an exercise of a wise discretion, really beneficial to the people of the State, and while debarring the companies from all right of explanation, confiscates their franchises upon the first conviction. The legislature can not raise a conclusive presumption of guilt against a natural person from an act that may be innocent in itself, taking from him the privilege of showing the actual innocence or propriety of the act, and confiscating his property as a penalty for the supposed offense. Those provisions of our constitution which forbid the deprivation of life, liberty or property, except by due process of law, and which guaranty the right of trial by jury " as heretofore enjoyed," and the right in all criminal prosecutions to appear and defend in person and by counsel, would all be violated by such a law. These provisions, it is true, are designed to apply only to natural persons, but artificial persons must be permitted to invoke the spirit of justice which prompted them, so far as may be necessary to protect their property and franchises against the operation of a law that substantially condemns without a trial.

That the naked fact that a railway company charges a larger sum for transporting freight of the same class over a given distance, than it is charging for the same distance over another part of its road, or in the opposite direction, is not, of itself, conclusive evidence of an unjust discrimination, will be manifest on a moment's consideration. Take, for instance, the road of the appellant, with one terminus at Chicago and the other at East St. Louis. At one season of the year more freights are moving from Chicago towards East St. Louis

than in the opposite direction.  The consequence, of course, is, that the supply of empty cars at the latter point will be in excess of the demand.  There is a water route between these points which also touches several intermediate stations upon the road.  Now, unless the railway company is permitted, under such circumstances, to induce shipments over its line by lowering its freights, it is evident that a portion of its cars will return empty.  This would, of course, necessitate a higher charge for freight moving towards St. Louis than it would be necessary to impose if return freights could be secured by lowering the rates on the return trip.  To forbid the company to lower the rates of return freight would thus benefit no one, and would work an injury both to the company and to the people along the line.  At other seasons of the year the larger amount of freights is moving in the opposite direction, and then the operation must be reversed.

We give this illustration for the purpose of showing that a difference of price for the same distance of transportation, is not necessarily an unjust discrimination, and that any law must be fatally defective which infers guilt, as a conclusive presumption, from the mere fact of difference of rates, without permitting the companies to show why the different rates were adopted.

We may so far take judicial notice of the course of public affairs in this State as to say that the real abuse which the legislature was endeavoring, by this act, to prevent, was not such proper discriminations as those we have just been supposing, but the practice, which had become general among the railways, of charging a higher compensation for carrying the agricultural products of the State to market when shipped at a station where there was no competing line, than when shipped where there was such competition, although the distance over which the freight was carried in the latter case might greatly exceed the distance in the former.  The same system also prevailed in regard to the freight from Chicago to points in the interior, although probably not felt to be so

great an evil. For discriminations of this character, when adopted as a system, we can certainly perceive neither justification nor excuse, but, nevertheless, it is the right of a company, when prosecuted on the ground of unjust discrimination, to offer what evidence it can by way of explanation. It might, for example, show in the present case, that the lumber shipped to Lexington had caused a greater expense in loading or unloading than that shipped to Bloomington. This may not be a very probable defense, but defenses may nevertheless exist, and if they do, the companies should not be deprived of the right to make them.

Before this act can be enforced, it should be so amended as to correspond with the requirement of the constitution by directing its prohibitions against *unjust* discriminations. It should make the charging of a greater compensation for a less distance, or for the same distance, merely *prima facie* evidence of unjust discrimination, instead of conclusive evidence, as it now is, and it should give to the railway companies the right of trial by jury, not only on the fact of discrimination, but upon the issue whether such discrimination is just or not.

There is another feature in this law to which we deem it our duty to advert. As the act now stands, a forfeiture of all franchises is the only penalty that can be imposed upon a company, in a prosecution instituted on behalf of the people, and it is imposed for the first offense. This, as already remarked, in some cases would amount to a fine of millions of dollars. Is not this a violation of the spirit of that constitutional provision which says, in terms, that "all penalties shall be proportioned to the nature of the offense?" Is it not also a violation of the spirit of the very clause of the constitution under which this act was framed, and which requires the legislature to pass laws to prevent unjust discrimination and extortion by railroad corporations, " and enforce such laws by adequate penalties, to the extent, *if necessary for that purpose,* of forfeiture of their property and franchises."

Would it not be better to enforce the law by a series of considerable and increasing fines, before imposing the final penalty of forfeiture?   A law admitting of but one penalty, and that of the harshest possible character, will necessarily be subjected by the courts to close criticism and a strict construction.

The English Parliament passed a law in 1854 prohibiting the giving of undue or unreasonable preferences or advantages by railway companies in the management of their business.   Under this act, various cases have arisen in the English courts, which have been cited by counsel.   It is unnecessary to comment upon them.   They hold, as we do, that a discrimination is not necessarily an unjust discrimination.   That is to be determined upon the evidence.

The opinion of the court is, that while the legislature has an unquestionable power to prohibit unjust discrimination in railway freights, no prosecution can be maintained under the existing act until amended, because it does not prohibit unjust discrimination merely, but discrimination of any character, and because it does not allow the companies to explain the reason of the discrimination, but forfeits their franchise upon an arbitrary and conclusive presumption of guilt, to be drawn from the proof of an act that might be shown to be perfectly innocent.   In these particulars the existing act violates the spirit of the constitution.

The judgment of the circuit court, ousting the appellant of its franchises, must, therefore, be reversed.

*Judgment reversed.*