## COE & MILSOM *v.* THE LOUISVILLE & NASHVILLE RAILROAD CO.

*(Circuit Court, M. D. Tennessee. ———, 1880.)*

1. RAILROAD—DELIVERY—INJUNCTION.—Complainants bought a lot contiguous to defendant's depot, in Nashville, and fitted up a stock yard thereon, at considerable expense. There was no express contract between complainants and the defendant in relation to the matter, but it was clear that such yard was a convenience to the defendant's business. By the permission or acquiescence of defendant, complainants' yard was connected with defendant's road by appropriate stock gaps and pens. After the same had been in use by both parties for more than 12 years the defendant entered into a contract with the Union Stock-Yard Company for the erection of a stock yard in the city of Nashville, outside the city limits, and more than a mile distant from complainant's yard; and said defendant, among other things, agreed that it would establish no other stock-yard in Nashville, and that it would deliver, and cause to be delivered, to the said Union Stock-Yard Company, all live stock shipped over its road, and consigned to the city of Nashville; and that it would make the stock yard of the said company its stock depot for said city, and would not deliver at any other point or points of the city, but agreed to deliver all stock shipped to the city of Nashville at the yards of the said Union Stock-Yard Company. Complainants, having been accordingly notified that no more stock would be delivered to them at their yard after a specified date, filed their bill, in which they prayed for an injunction to restrain "defendant's agents and officers and servants from interfering with or in any manner disturbing the enjoyment and facilities now afforded to complainants by said defendant upon its lines of railway, for the transac-

tion of business now carried on by the complainants, and especially from excluding or inhibiting persons from consigning stock to complainants, and from refusing to receive and transport stock from complainants' yard, and from interfering with or in any way disturbing the business of the complainants, and from refusing to permit the complainants to continue their business on the same terms as heretofore."

*Held,* that the complainants were entitled, preliminarily, to the relief prayed for.

*A. S. Colyar,* for complainants.

*Ed. Baxter, Smith & Allison,* and *Dickinson & Frazer,* for defendant.

BAXTER, C. J. The defendant corporation owns the Louisville & Nashville Railroad, and, in virtue of its purchase of the south-eastern lease of the Nashville & Decatur, and ownership of a majority of the capital stock of the Nashville, Chattanoga & St. Louis Railway Company, controls every railroad centering at Nashville. It has, for many years past, been engaged in carrying such freights as are usually transported by rail, including live stock. Twelve or more years since, when it needed facilities for loading and delivering live stock, the complainants bought a lot contiguous to defendant's depot, in Nashville, at $14,000, and fitted it up as a stock yard, at a cost of $16,000 more. There was no express contract between complainants and defendant in relation to the matter. But it is clear that it was a convenience to defendant's business. By the permission or acquiescence of defendant, complainants' yard was connected with defendant's road by appropriate stock gaps and pens, which have been in use by both parties for more than twelve years; but on the twenty-fifth of March, 1880, the defendant and the Nashville, Chattanooga & St. Louis Railway Company entered into a contract with the Union Stock Yard Company, whereby the said stock-yard company stipulated "to erect, maintain, and keep in good order," etc., "a stock yard in the city of Nashville, on the line of the Nashville, Chattanooga & St. Louis Railway," outside the city limits, and more than a mile from complainants' yard. And the parties of the first part—the railroad companies—among other things, agreed that "they would establish no other stock yard in Nashville," and that they

would "deliver, and cause to be delivered, to said party of the second part all live stock shipped over the roads of the parties of the first part, and consigned to the city of Nashville; the parties of the first part hereby agreeing to make this stock yard of the party of the second part their stock depot for said city, and will not deliver at any other point or points of the city, and agree to deliver all live stock shipped to said city of Nashville at the yards of the party of the second part."

In furtherance of this contract Edward B. Stahlman, defendant's traffic manager, and owner of $5,000 of the capital stock of the stock-yard company, issued the following order, addressed to defendant's agent, dated July 10, 1880: "On the fifteenth inst. there will be opened and ready for business the stock yards erected by the Union Stock Yard Company, at Nashville, Tenn. These yards have every facility for the proper handling and care of live stock, and will be constituted our stock delivery and forwarding depots. Live stock from and after that date consigned to Nashville proper, or destined to any points over our line via Nashville, should be way-billed care of the Union Stock Yards;" and on the twenty-fourth of the same month James Geddes, defendant's superintendent, supplemented the foregoing order with a notice to complainants in the following words: "I am directed by Mr. De Funiak, general manager, to notify you that after the last day of July, 1880, no delivery of stock will be made to you at our platform here, Nashville depot," to-wit, the platform, gaps and pens communicating with complainants' yard, where the defendant had heretofore delivered to them.

Complainants remonstrated against this threatened discrimination against them and their business; but, being unable to induce any change in defendant's avowed policy, filed their bill in which they pray for an injunction to restrain "defendant's agents and officers and servants from interfering with or in any manner disturbing the enjoyment and facilities now accorded to complainants by the said defendant upon its lines of railway, for the transaction of business now carried on by the complainants, and especially from exclud-

ing or inhibiting persons from consigning stock to complainants, and from refusing to receive and transport stock from complainants' yard, and from interfering with or in any way disturbing the business of the complainants, and from refusing to permit the complainants to continue their business on the same terms as heretofore." The injunction asked for is both inhibitory and mandatory; it seeks to prohibit the doing of threatened and alleged wrongful acts, and to compel defendant to continue the facilities and accommodations heretofore accorded by defendant to complainants; and the question is, are complainants entitled, preliminarily, to the relief prayed for, or any part of it?

The facts suggest the very important inquiry, how far railroads, called into being to subserve the public, can be lawfully manipulated by those who control them to advance, incidentally, their own private interests, or depress the business of particular individuals or localities, for the benefit of other persons or communities. As common carriers they are by law bound to receive, transport, and deliver freights, offered for that purpose, in accordance with the usual course of business. The delivery, when practicable, must be to the consignee. But the rule which requires common carriers by land to deliver to the consignee personally at his place of business, has been somewhat relaxed in favor of said roads on the ground that they have no means of delivering beyond their lines; but it was held in *Vincent* v. *The Chicago & Alton R. Co.* 49 Ill. 33, that at common law, and independent of the statute relied on in the argument, that in cases where a shipment of grain was made to a party having a warehouse on the line of the carrying road, who had provided a connecting track and was ready to receive it, it would be the duty of the railroad company to make a personal delivery of the grain to the consignee at his warehouse; because, say the court, "the common-law rule must be applied, as the necessity of its relaxation" did not exist.

This rule is just and convenient, and necessary to an expeditious and economical delivery of freights. It has regard to their proper classification, and to the circumstances of the

particular case. Under it articles susceptible of easy transfer may be delivered at a general delivery depot provided for the purpose. But live stock, coal, ore, grain in bulk, marble, etc., do not belong to this class. For these some other and more appropriate mode of delivery must be provided. Hence it is that persons engaged in receiving and forwarding live stock, manufacturers consuming large quantities of heavy material, dealers in coal, and grain merchants, receiving, storing, and forwarding grain in bulk, who are dependent on railroad transportation, usually select locations for the prosecution of their business contiguous to railroads, where they can have the benefit of side connections over which their freight can be delivered in bulk at their private depots; and may a railroad company, after encouraging investments in mills, furnaces, and other productive manufacturing enterprises on its line of road, refuse to make personal delivery of the material necessary to their business, at their depots, erected for the purpose, and require them to accept delivery a mile distant, at the depot of and through a rival and competing establishment? Or may such railroad company establish a "Union Coal Yard" in this city, and constitute it its depot for the delivery of coal, and thus impose on all the coal dealers in the city, with whom it has side connections, the labor, expense, and delay of carting their coal supplies from such general delivery to their respective yards? Or may such railroad company, in like manner, discriminate between grain elevators in the same place,—constitute one elevator its depot for the delivery of grain, and force competing interests to receive from and transfer the grain consigned to them through such selected and favored channel?

If railroad corporations possess such right, they can destroy a refractory manufacturer, exterminate or very materially cripple competition, and in large measure monopolize and control these several branches of useful commerce, and dictate such terms as avarice may suggest. We think they possess no such power to kill and make alive. Impartiality in serving their patrons is an imperative obligation of all railroad companies; equality of accommodations in the use

of railroads is the legal right of everybody. The principle is founded in justice and necessity, and has been uniformly recognized and enforced by the courts. A contrary idea would concede to railroad companies a dangerous discretion, and inevitably lead to intolerable abuses. It would, to a limited extent, make them masters instead of the servants of the public. By an unjust exercise of such a power they could destroy the business of one man and build up that of another, punish an enemy and reward a friend, depress the interests of one community for the benefit of its rival, and so manipulate their roads as to compel concessions and secure incidental profits to which they have no legal or moral right whatever.

The case in hand is but a sample of what might be done by these corporations if the power claimed in this case is possessed by them. Complainants' stock yard was purchased and fitted up at a heavy outlay of money. It was, at the time, a necessity to defendant's business. By the express agreement or tacit understanding of the parties suitable connections for receiving and delivering stock were made, of which the defendant availed itself for 12 years. But, after thus accepting the benefits of complainants' expenditures, the defendant proposes to sever its connections, withhold further accommodations, decline to receive from or deliver stock at complainants' yard, concentrate its patronage on the Union Stock Yard Company, require all consignors to way-bill their stock to the care of said favored company, and, by this invidious discrimination, compel complainants to carry on their trade through a rival yard, or else abandon their established and lucrative business. The execution of defendant's threat would destroy complainants' business, depreciate their property, and deprive the public of the protection against exorbitant charges which legitimate competition, conducted on equal terms, always insures. Complainants' yard is on defendant's road; it furnishes every needed facility; was purchased and improved in the belief that they would receive the same measure of accommodation extended to others sustaining the same relation to defendant; defendant can receive

and discharge stock at complainants' yard as easily and cheaply as it can at the Union Stock Yard Company's yards. Such delivery is both practicable and convenient, and it is, we think, its legal duty, under the facts of this case, to do so.

But defendant, protesting that the proposed discrimination in favor of the Union Stock Yard Company would, if executed, constitute no wrong of which complainants ought justly to complain, contends—*First*, that complainants, even supposing the law to be otherwise, have an adequate remedy at law, and therefore cannot have any relief from a court of chancery; and, *second*, that if a chancery court may entertain jurisdiction, no relief in the nature of a mandatory order to compel defendant to continue accommodations to the complainants ought to be made until the final hearing. If such is the law it must be so administered. But we do not concur in this interpretation of the adjudications. Those cited in argument are not, we think, applicable to the facts of this case. Complainants could, in the event defendant carries its threat into execution and withholds the accommodations claimed as their right, sue at law and recover damages for the wrong to be thus inflicted. But they could not, through any process used by courts of law, compel defendant to specifically perform its legal duty in the premises. And this imperfect redress could only be attained through a multiplicity of suits, to be prosecuted at great expense of money and labor; and then, after reaching the end through the harassing delays incident to such litigation, complainants' business would be destroyed, and the Union Stock Yard Company, born of favoritism and fostered by an illegal and unjust discrimination, would be secure in its monopoly. Here an adequate remedy can be administered and a multiplicity of suits avoided.

One other point remains to be noticed. Ought a mandatory order to issue upon this preliminary application? Clearly not, unless the urgency of the case demands it, and the rights of the parties are free from reasonable doubt. The duty which the complainants seek by this suit to enforce is one imposed and defined by law—a duty of which the court has judicial knowledge. The injunction compelling its performance, pend-

ing this controversy, can do defendant no harm; whereas a suspension of accommodations would work inevitable and irreparable mischief to complainants. The injunction prayed for will, therefore, be issued.