Atherton, J.
The main question in this case, and to which all others are subordinate, is this:
Has the defendant a right to discriminate between its freighters and customers, and furnish transportation to one at a less rate than to others, in a case where such discrimination is injurious to and destructive of the legitimate business of others?
That ultimate question requires the consideration of several other propositions and queries, some of which may be stated as follows:
1. What where the rights and duties of common carriers at common law, and was the shipper entitled to have his goods shipped at a rate equal to that charged to others, or was-he entitled to any protection other than to have his goods transported for a reasonable compensation?
2. What changes, if any, have been made by statute in this state touching the duties and liabilities of a common carrier at common law ?
3. Is the contract made between the defendant and the Standard Oil Company, and mentioned in the pleadings, good in law, or is it void on grounds of public policy?
4. Can the remedy sought by plaintiffs in this case be administered by a court of equity by means of-an injunction ?
The district court has found that the defendant is a consolidated railroad company owning and operating a railroad extending from Buffalo, New York, to Chicago, Illinois, passing through Ohio and parts of Pennsylvania, Indiana, Michigan and Illinois, with branches extending to Detroit and Grand Rapids, and that defendant is a public corpora *593 tion and a common carrier in the business of transporting persons and property for hire and reward over its line and branches.
The defendant having acquired through its charter the light of eminent domain and the franchise to construct its road, and to demand and receive tolls, is to be distinguished from a mining or manufacturing or other private corporation. By accepting its charter, and claiming and exercising the peculiar rights and privileges enjoyed by public corporations, and “ being a creature of the law and intrusted with the exercise of sovereign power to subserve public necessities and uses, the defendant is bound to conduct its affairs in furtherance of the public objects of its creation.”
The legal theory seems to be that it is the duty or the right of governments to provide improved facilities for the public travel and transportation at the public expense, and this duty has been discharged by all civilized governments. It was found that these improved modes of travel and transportation could not always be provided by private enterprise, and that to construct canals, turnpikes, railroads, etc., required the exercise of the right of eminent domain, and the powers of general taxation. In the further progress of events as private wealth increased, it was found politic and convenient to entrust these functions of the government to individuals united together as public corporations under a grant of the government. The railroad corporation in consideration of the franchise received, giving the public the right to use its road, and subjecting itself to the restraint of the government through its legislature and judiciary, to prevent any abuse of the powers so granted.
“While the law affords railroad corporations adequate and complete protection in the exercise of their chartered rights, it also holds them to a strict performance of the public duties enjoined upon them as a consideration for the rights and powers thus granted. In cases of apparent conflict between the rights and powers conferred and the duties imposed, the solution may oftentimes be *594 rendered easy by regarding the admitted right of public use as the touchstone of judicial interpretation.” Railroad Commissioner v. P. & O. C. R. Co., 63 Me. 269-278.
It is because of the fact that such corporations are public corporations-, being vested with a portion of sovereign power delegated to them by the state, and owing duties to the public, that they have been held subject to the right of mandamus to oblige them to fairly and fully carry out the public object of their creation. Rex v. Barker, 3 Burr. 1267; State v. Railroad Company, 29 Conn. 538; Ang. & Ames on Corp. 694.
It is on the same theory that acts of the legislature have been sustained as constitutional, requiring railroad corporations to establish stations at particular places on their roads, and to supply reasonable accommodations to the people of the smaller localities, and to do justice to the different sections through which their railroads pass. Commonwealth v. Pastern R. Co., 103 Mass. 258.
The fact that parties using the road are required to pay fare for transportation in no way conflicts with the views expressed.
“ The fare is the consideration for the service performed, whether done by the state directly, or by a corporation under a grant from the state; it is simply a substitute for the tax rendered necessary when the state builds and conducts railroads at the public expense ; the corporation upon the payment of the fare, is under the same obligation to render the required service for the public, that the state would be, if railroads were free, and conducted by state authority. Nor does the ownership of railroads, whether it be in the state or a private corporation, affect the nature of their use, since in either case the function to be exercised, and the uses to be subserved are public.” Railroad, Commissioner v. P. & O. C. R. Co., supra, 275.
“ In considering the right of the public to the use of rail-. roads, and the public interest resulting from this right, it should not be overlooked that the payment of fares is more than compensated, in general, by the reduced expense of *595 travel and transportation by this mode over other means of conveyance, in addition to the other advantages, public, private and local, resulting from the establishment of railroads. • ■ • This beneficial public interest is intended, among others, to he secured under the franchise granted to railroad corporations; and the public have an interest that this result should be attained and maintained by them.” Ib., 276-7.
A similar doctrine is stated by the supreme court of Pennsylvania :
“ Wherever a charter is granted for the purpose of constructing a railroad, and the corporation is clothed with the power to take private property in order to carry out the object, it is an inference of law from the extent of the power conferred, and subject-matter of the grant, that the road is for the public accommodation. The right to take tolls is the compensation to be received for the benefits conferred. If the public are entitled to these advantages, it results from the nature of the right that the benefits should be extended to all alike, and that no special privileges should be granted to one man or set of men, and denied to others.” Sanford v. Railroad Co., 24 Pa. St. 878.
The learned Chief Justice Beasley, in pronouncing the judgment of the supreme court of New Jersey, said : “ In my opinion, a railroad company, constituted under statutory authority, is not only by force of its inherent nature a common carrier • • • but it becomes an agent of the public in consequence of the powers conferred upon it. A company of this kind is invested with important prerogative franchises, among which are the rights to build and use a railway and to charge and take tolls and fares. These prerogatives are grants from the government, and public utility is the 'consideration for them. Although in the hands of a private corporation, they are still sovereign franchises, and must be used and treated as such; they must be held in trust for the general good. If they had remained under the control of the state, it could not be pretended that in the exercise of them, it would have been *596 legitimate to favor one citizen at the expense of another. If a state should build and operate a railroad, the exclusion of every thing like favoritism with respect to its use would seem to be an obligation that could not be disregarded without violating natural equity and fundamental principles. • • • In their very nature and constitution, as j view this question, these companies become, in certain aspects, public agents, and the consequence is, they must, in the exercise of their calling, observe to all men a perfect impartiality.” Messenger v. Pennsylvania R. Co., 36 N. J. Laws, 407.
“A railroad corporation, in view of its origin, objects, uses, and the control of the government over it, is a public corporation, though its shares may be owned by private individuals. It is a governmental agency for public purposes.” Talcott v. Townshif of Pine Grove, 1 Flippin, 120. See also McDuffee v. P & R. R. Co., 52 N. H. 430.
The defendant’s attorneys in their brief, well say ’. “ It can not be questioned that the reason why a common carrier is restricted to a reasonable rate is the same that causes the limitation at common law upon the rates charged by a wharfinger licensed under the statute. In reference to a railroad company, it may be truly said that it exercises a quasi public employment. While railroads are managed for private benefit, and their profits arising from their operation go to individuals, yet they are treated as merely a public convenience and agency in the matter of state and interstate commercial intercourse.” And see Erie & N. E. Railroad v. Casey, 26 Pa. St. 287.
The above authorities abundantly show that railroad companies are common carriers, receiving from the state a delegation of a portion of its sovereign powers for the public good. That being public agents and, in the place and stead of the government, exercising public duties, they are therefore subject to the legislative and judicial authority to correct the abuse of their privileges and powers.
The next question is, whether these quasi public agents *597 are required to treat all citizens and customers alike as to terms upon which they will transport freight.
It is claimed by the defendant that it is not bound to carry freights for all freighters at the same rate, but its duty is fully discharged if it carries for all, charging none more than a reasonable rate. On the contrary the plaintiffs contend that, at least under the facts of this case, they are entitled to the same rates as their more favored rival. They allege, and the court find, that they have been and are carrying on in a large way, at Cleveland, Ohio, the business of refining crude petroleum, and selling it in the region reached by the defendant’s railroad, branches, and connecting lines. That they have a large capital' so employed, and have established a large and profitable trade throughout such territory. That their refinery cost about $70,000, and that plaintiffs have a refining capacity of about 150,000 barrels per year. And it is contended, and the facts would seem to establish, that the admitted difference of 10 cents a barrel between the rate charged plaintiffs and that charged the Standard Oil Company, would make to the plaintiffs, if there was no discrimination practiced, a yearly sum of $15,000 on the out-put of plaintiff, or more than twenty-one per cent on the capital used in their business. That the Standard Oil Company is and has been engaged in the same .business at Cleveland and elsewhere, and has manufactured and shipped nine-tenths of all the oils manufactured at and shipped from Cleveland, and that by the terms of an agreement entered into in 1875, the defendant contracted with the Standard Oil Company that in consideration of the promise of the company to ship all their product of petroleum over the defendant’s railroad, it undertook to ship the same at an average rate of about ten cents per barrel below its published rates ; and that plaintiffs were compelled to pay at the same time according to the published rates. Plaintiffs claim that by this discrimination, in favor of the Standard Oil Company, the latter are afforded an unfair discrimination and adyantage, and can put their product on the *598 market at a less price than the plaintiffs can afford, and thereby their profits are reduced; and by this unlawful discrimination in favor of the Standard Oil Company, the defendant is inflicting upon them great and irreparable damage, and renders it impossible to successfully compete with that company in the market, and thereby the business and trade of plaintiffs is being injured and destroyed., It will be observed that the gist of plaintiffs contention is not so much that the latter are charged a rate of compensation for transportation unreasonable in itself, as that by charging a lower rate to their more favored competitor, the latter is enabled to and is supplying the market at a price with which the plaintiffs can not compete, and thus driving them out of the market and destroying the business and trade they have built up. One of the questions at issue between the parties is: What was the doctrine of the common law on the question of the compensation of a common carrier? Could the freighter require any thing more than that he be charged no more than a reasonable compensation, or could he demand and have his goods transported at an equal rate with the favored customer l
In many cases it has been held that the customer was only entitled to have his goods shipped at a reasonable rate, and not necessarily at an equal rate with others; and that he was not interested in the matter that somebody else was charged less. Or in the incisive language of Crompton, J., to counsel in an English case : “ The charging another person too little is not charging you too much.”/
The question, so far as it related to railroads, was settled by statute in England shortly after their introduction there; and under the “ equality clause ” of the English statutes railroad companies were bound to charge equally to all persons in respect to all goods under like circumstances. Pickford v. Grand Junction R. Co., 10 M. & W. 399 ; Baxendale v. London & Southwestern Railway Company, L. R., 1 Ex. 137; L. & N. W. R. Co. v. Evershed, 26 W. R. 863.
*599 And by 17 and 18 Viet., c. 31, §§ 2, 3, and 6, the court of common pleas was empowered to restrain by injunction any railway or canal company from giving undue or unreasonable preference to any particular person or description of traffic. See notes to Coggs v. Bernard, 1 Smith. L. C. 369. So for a long period of time the English courts have had no occasion to examine the condition of the common law upon the subject independent of the i ' tute.
In C. & A. R. Co. v. The People ex rel., etc., 67 Ill. 11, 17, Lawrence, C. J,, affirms: “ Another perfectly well-settled rule of the common law in regard to common carriers is, that they shall not exercise any unjust and injurious discrimination between individuals in their rates of toll. . . . While the law now imposes, and always has' imposed, upon individuals exercising the vocation of a common- carrier, the obligation of rendering service to all persons without injustice to any, how utterly unreasonable it is to claim that a corporation is to be permitted to discriminate in its tolls at its own discretion and without regard to justice,” etc.
In discussing the English “equality statute” before adverted to, Beasly, C.J., pronouncing the opinion of the supreme court of New Jersey, says : '
“But the courts of Pennsylvania have repeatedly declared that this act was but declaratory of the doctrine of the common law. . . . In a more recent decision, Mr. Justice Strong says that the special provisions which are sometimes inserted in railroad charters in restraint of undue preferences, are * but declaratory of what the common law now is/ This is the view which, for reasous already given, I deem, correct.” Messenger v. Pennsylvania R Co., 36 N. J. Law, 407-412.
In some of the cases it is announced that upon the question of whether the law requires the common carrier to transport goods upon equal terms to all, or whether it only requires that the rate shall be reasonable, but not neces *600 sarily equal to all, has been differently determined by the courts of England and America. Ragan v. Aiken 9 B. J. Lea, 609; s. c., 42 Am. Rep. 684.
But be that as it may, the tendency and undoubted weight of authority is in favor of the doctrine that a common carrier is charged with a quasi public duty to transport merchandise on equal terms for all parties, where the carrying for some shippers at a lower price than for others will create monopoly by injuring or destroying the business of those less favored.
“An agreement by a railroad company to carry goods for certain persons at a cheaper rate than they will carry under the same conditions for others, is void as creating an illegal preference.” Messenger v. Pennsylvania R. Co., supra. The Chief Justice, p. 410, says :
“ It can not be denied that at the common law every person Under identical conditions had an equal right to the services 'of their commercial agents. It was one of the primary obligations of the common carrier to receive and" carry all goods offered for transportation, upon receiving a reasonable hj're. If he refused the offer of such goods, he was liable to an action, unless he could show a reasonable ground for his refusal. Thus, in the very foundation and substance of the business there was inherent a rule which excluded a preference of one consignor of goods over another. The duty to receive and carry was due to every member of the community, and in an equal measure to each. . . . Recognizing this a3 the settled doctrine, I am not able to see how it can be admissible for a common carrier to demand a difieren t hire from various persons, for an identical kind of service under identical conditions. Such partiality is legitimate in private business, but how can it square with the obligations of a public employment? A person having a public duty to discharge, is undoubtedly bound to exercise such office for the equal benefit of all; and, therefore, to permit the common carrier to charge various prices, according to the person with whom he deals, for the same services, is to forget *601 that he owes a duty to the community. . . . The law that forbids him to make any discrimination in favor of the goods of A over the goods of B, when the goods of both are tendered for carriage, must, it seems to me, necessarily forbid any discrimination with respect to the rate of pay for the carriage. . . . The rule that the carrier shall receive all the goods tendered, loses half its value as a politic regulation, if the cost of transportation can be graduated by special agreement so as to favor one party at the expense of the other.
The same questions came up on error after issue had been joined and a trial had below, and are reported in 37 N. J. Law, 58L And Judge Beadle, speaking for the court, says, on p. 534:
“The business of the common carrier is for the public, and it is his duty to serve the public indifferently. ... In the very nature, then, of his duty and of the public right, his conduct should be equcd and just to all. So, also, there is involved in the reasonableness of his compensation the same principle. A want of uuiformity in price for the same kind of service under like circumstances is most unreasonable and unjust, when the right to demand it is common. . . . A direct refusal to carry for a reasonable rate would involve the carrier in damages; and a refusal in effect could be accomplished by unfair and unequal charges. . . . A common carrier owes an equal duty to all, and can not be discharged if he is allowed- to make unequal preferences, and thereby prevent or impair the enjoyment of the common right.”
The supreme court of New Hampshire, in McDuffee v. Railroad, 52 N. H. 447, in an action for damages for refusing to carry freight for the plaintiff at the same rate and with like facilities granted to others, say:
“A common carrier is a public carrier. He engages in a public employment, takes upon himself a public duty, and exercises a sort of public office. . . . His duty being public, the correlative right is public. The public right is a com *602 mon right, and a common right signifies a reasonably equal right.”
Again, on page 450, the court say: “Equality in the sense of freedom from unreasonable discrimination being of the very substance of the common right, an individual is deprived of his lawful enjoyment of the common right when he is subjected to unreasonable and injurious discrimination in respect to terms, facilities, or accommodations.”
On page 451, the court further say : “ The common and equal right is to reasonable transportation service for a reasonable compensation. Neither the service nor the' price is necessarily unreasonable because it is unequal in a narrow, strict, and literal sense. . . . The question is not whether the service or price is absolutely unequal in the narrowest sense, but also whether the inequality is unreasonable and injurious.”
On page 453, the court, in discussing the case of Garton v. B. & E. R. Co., 1 B. & S. 112, et seq., where it was not found that any unreasonable inequality had been made by the defendant to the detriment of the plaintiffs, say : “ it was held that a reasonable price paid by them was not made unreasonable by a less price paid lay others,” but the court continues:
“But before that conclusion is reached, it may be necessary to determine whether the receipt of a less price from another person was á matter of charity or an unreasonable discrimination and a. violation of the common right. Charging A less than B for the same service, or service of the-same value, is not of itself necessarily charging A too little or charging B too much; but it may be evidence tending to show that B is charged too much, either by being charged more than the actual value of the service, or being made the victim of an unjustifiable discrimination. . . . If an apparent discrimination is found to have been real one, the question is whether it was reasonable, and if unreasonable, whether the party complaining was injured by it.
*603 Among the earliest is the case of Sandford v. Railroad Co., 24 Pa. St. 378.
This action was by bill in chancery to enjoin defendant from excluding from its railroad plaintiffs, who were owners of a line of express. The reason for exclusion given was that defendant had contracted with another express company to give it exclusive transportation. The court say, p. 380 :
“ A railroad is a public highway for public benefit. The nature of this peculiar and improved class of highways make it indispensable to the public safety that the transportation on it should be placed under the strict regulation of one controlling head. . . . When this power is assumed, the company becomes a common carrier, and thus exercises a sort of public office, and has public duties to perform. It is bound to receive and carry all the goods offered for transportation. ... If the public are entitled to these advantages, it results from the nature of the right that the benefits should be extended to all alike, and that no special privileges should be granted to one man or set of men and denied to others.”
On page 382 the court further say: “The power to regulate the transportation on the road does not carry with it the right to exclude any particular individuals or to grant exclusive privileges to others. Competition is the best protection to the public, and it is against the policy of the law to destroy it by creating a monopoly of any branch of business. It can not be done except by the clearly expressed will of the legislative power. . . . If it possessed this power it might build up one set of men and destroy others; advance one kind of business and break downanother; and might make even religion and politics the tests in the distribution of its favors. . . . The rights of the people are not subject to any such corporate control. A regulation, to be valid, must operate on all alike. If it deprives any persons of the benefits of the road or grants, exclusive privileges to others, it is against law and void.”
*604 “A railroad company is chartered, and is chartered solely, for the purpose of exercising the functions and performing the duties of a common carrier. The duties and liabilities of common carriers are clearly defined by the common law, and have been defined for centuries. ... In accepting their charters, which gave them an artificial existence as common carriers, they necessarily accepted them with all the duties and liabilities attached, by the existing law, to the functions of a common carriér. . . While the law now imposes, and always has imposed, upon individuals exercising the vocation of a common carrier, the obligation of rendering seiwice to all persons without injustice to any, how utterly unreasonable it is to claim that a corporation is to be permitted to discriminate in its tolls at its own discretion and without regard to justice,” etc. C. & A. R. Co. v. The People ex rel., supra, 16.
In the case of Shipper v. Railroad Co., 47 Pa. St. 388, the actipn was brought to recover an overcharge of freight. The court, speaking of defendant’s charter, say, on p. 340:
“ There is no expressed stipulation that the rates shall be equal to all who may offer goods for transportation over the road. . . . Such stipulations are common in English railway charters. They are, however, but declaratory of what the common law is.”
In Audenried v. P. & R. R. Co., 68 Pa. St. 370, a bill was brought to enjoin defendant from refusing to plaintiff privileges granted to others. The court say, on p. 380:
“ Transportation by a common carrier is necessarily open to the public upon equal and reasonable terms.”
In New England Express Co. v. M. C. R. Co., 57 Me. 188, an action in case for damages was brought under circumstances like those that gave the ground for injunction in Sandford v. Railroad Co., supra. Defendant had refused to carry goods for plaintiff because some years before it had made a contract with another express company to give it the exclusive right to carry express matter on its cars. The court say:
*605 “ Common carriers arebound to carry indifferently, within the range of their business, for a reasonable compensation, all freight offered. For similar equal services they are entitled to the same compensation. . . . They can not legally give undue and unjust preferences, or make unequal and extravagant charges. ... A toll is granted. But a toll implies uniformity of compensation for equality of service. . . . The very definition of a common carrier excludes the idea of the right to grant monopolies, or to give special and uneqal preferences. It implies indifference as to whom they may serve, and an equal readiness to serve all who may apply, and in the order of their application. The defendants derive their chartered right from the state. They owe an equal duty to each citizen. They are allowed to impose a toll, but it is not to be so imposed as specially to benefit one and injure another. . . . Such is the common law on the subject. The legislation of the state has been in accordance with, and in conformity of, these views.”
In Illinois the disposition in the railroads to discriminate seems to have taken the type of charging more for delivery to one warehouse than to another in the same city.
And in Vincent v. Railroad Co., 49 Ill., 33, it was decided that a railroad will not be permitted to charge one rate of delivery to one warehouse and a different rate to another.
In Chicago and N. W. Railway Company v. People, 56 Ill. 365, the application below was for mandamus to compel delivery of grain to the elevator to which it was consigned.
On p. 378 the court say: “Regarded merely as a common carrier ¡it common law, and independently of any obligations imposed by the acceptance of its charter, it would owe important duties to the public, from which it could not release itself except with the consent of every person who might call, upon it to perform them. Among these duties, as well defined *606 and settled as any thing in the law, -was the obligation to receive and carry goods for all persons alike, without injurious discrimination as to terms.”
In Dinsmore, Prest. v. Railroad Company, 2 Fed Rep. 465, two similar cases were disposed of by Judge Baxter, one in the circuit court of the United States for Kentucky, and the other for Tennessee.
On pp. 469,476, Judge Baxter, having treated of the duty to supply all the accommodations and facilities demanded .by the business of the country, says :
“And next in importance to this leading idea, is the obligation to do exact and even-handed justice to everybody offering to do business with them. . . . The defendant, to the extent of its corporate authority, the Union Express Company, and all other persons or companies .wishing to engage in the carrying of express matter over defendant’s road, can enter upon that business on equal terms with the complainant. Neither the railroad companies nor the courts can discriminate in favor of one or more parties, or against others. All are entitled to the same measure of accommodation who may offer to do the like business, and it is the duty of the court to enforce, whenever applied to, this legal rule of impartial justice.”
Five cases, reported in 10 Fed. Rep. 210, were decided, before Justice Miller and Judges McCrary and Treat, arising in the various circuit courts of the United States for Mississippi, Arkansas, Kansas, and Colorado; and Justice Miller, on p. 214, states as the fifth point in his opinion :
“I am of the opinion that it is the duty of every railroad company to provide such conveyances, by special cars or otherwise, . . . asare required for the safe and proper transportation of this express matter on their roads, and that the use of these facilities should be extended on equal terms to all who are actually and usually engaged in the express business.”
The case of Hays v. Pennsylvania Company, 12 Fed. Rep. *607 809, decided by Baxter, J., in tbe circuit court of the United States, for the northern district of Ohio, is important in respect to one element in this case. The defendant in the case at bar claims that it was proper to enter into the contract it did with the Standard Oil Company, on account of the very large amount of freightage that company annually furnishes, and that it was lawful to discriminate in their favor on that account. The plaintiffs in that case had been engaged for several years in mining and shipping coal from Salineville, and the defendant’s railroad furnished them their only means of'getting their coal to market. The railroad company discriminated in favor of every shipper who shipped five thousand tons or over, and the discrimination was from thirty to seventy cents per ton, graduated by the amount shipped.
Plaintiffs were required to and did under the discrimination paya higher rate than their more favored competitors. They brought suit to recover for the discrimination, and, under the instructions of the trial judge, the jury returned a verdict for plaintiffs.
The judge on a motion for a new trial said:
“ The defendant is a common carrier by rail. Its road, though owned by the corporation, was nevertheless constructed for public uses, and is, in a qualified sense, a public highway. Hence everybody constituting a part of the public, for whose benefit it was authorized, is entitled to an equal and impartial participation in the use of the facilities it is capable of affording. . . .
“ The discrimination complained of rested exclusively on the amount of freight supplied by the respective shippers during the year. Ought a discrimination resting exclusively on such a basis to be sustained? If so, then the business of the country is in some degree subject to the will of railroad officials; for if one man engaged in mining coal, and dependent on-the same railroad for transportation to the same market, can obtain transportation thereof at from twenty-five to fifty cents per ton less than another compet *608 ing with him in business, solely on the ground that he is able to furnish, and does furnish, the larger quantity for shipment, the small operator will, sooner or later, be forced to abandon the unequal contest, and surrender to his more opulent rival. If the principle is sound in its application to rival parties engaged in mining coal, it is equally applicable to merchants, manufacturers, millers, dealers in lumber and grain, and to every body else interested in any business requiring any considerable amount of transportation by rail; and it follows that the success of all such enterprises would depend as much on the favor of railroad officials as upon the energies and capacities of the parties prosecuting the same. It is not difficult with such a ruling to forecast the consequences. The men who control railroads would be quick to appreciate the power with which such a holding would invest them, and, it may be, not slow to make the most of their opportunities; and, perhaps, tempted to favor their friends to the detriment of their personal or political opponents ; or demand a division of the profits realized from such collateral pursuits as could be favored or depressed by discriminations for or against them; or else, seeing the augmented power of capital, organize into overshadowing combinations, and extinguish all petty competition, monopolize business, and dictate the price of coal and every other commodity to consumers. We say these results might follow the exercise of such a right as is claimed for railroads in this case. But we think no such power exists in them; they have been authorized for the common benefit of every one, and can not be lawfully manipulated for the advantage of any class at the expense of any other. Capital needs no such extraneous aid. It possesses inherent advantages which can not be taken from it. But it has no just claim, by reason of its accumulated strength, to demand the use of the public highways of the county, constructed for the common benefit of all, on more favorable terms than are accorded to the humblest of the land; and a discrimination in favor of parties furnishing the largest quantity of freight, and solely on that ground, is a discrimination in favor of capital, and is contrary to *609 a sound public policy, violative of that equality of right guaranteed to every citizen, and a wrong to the disfavored party, for which thp, courts are competent to give redress.”
The district court, in their finding 10½, state that shipment by the car-load was the manner in which nearly all the business was done. That on the request of either party to furnish cars, the defendant had them switched to the refineries, and after being loaded were switched back and placed on defendant’s tracks for shipment on its road.
The manner of making shipments for plaintiffs and for the Standard Oil Company was precisely the same, and the only thing to distinguish the business of the one from the other was the aggregate yearly amounts of freight shipped. We adopt the reasoning of Baxter, J,, as the better law, andT hold that a discrimination in the rate of freights resting exclusively on such a basis ought not to- be sustained. The principle is opposed to a sound public policy. It woul<y^'| build up and foster monopolies, add largely to the accumulated power of capital and money and drive out all enter-,. prise not backed by overshadowing wealth. With the doc-ir trine, as contended for by the defendant, recognized and enforced by the courts, what will prevent the great grain interest of the north-west, or the coal and iron interests of Pennsylvania, or any of the great commercial interests of the country, bound together by the-power and influence of aggregated wealth and in league with the railroads of the land, driving to the wall all private enterprises struggling for existence, and with an iron hand thrusting back all but themselves ?
The defendant can derive no benefit or advantage far this case from its contract with the Standard Oil Company, and its discriminations can not be upheld because of the existence of the same.
We have already held that the contract is opposed to public policy and void.
This court has held in Crawford v. Wick, 18 Ohio St. 190, *610 that a contract in restraint of trade, to the injury of others and tending to monopoly, extortion and oppression, was contrary to public .-policy and void. That was a case where a firm, engaged in mining, contracted with a merchant who owned a neighboring store, that the miners should use their influence to have all their employes purchase all their goods and supplies from the merchant, and that they would neither accept orders on or give orders to other stores, etc. BrinkerhofF, J.,in a characteristic and quaint opinion, among other things, said: “Selecting now'a single gem from the casket of precious things, we hold it up to the light. Here it is : The lessees agree that they will not ‘ accept, receive or pay any order or orders drawn by any of’ their ‘employes or agents or their representatives, for goods, wares or merchandise . . . purchased by him or them of any other store, firm or persons, nor give any such employes or agents any order or orders to any other store, firm or persons for goods, wares or merchandise, or any note or other evidence of indebtedness, in order that the same may be disposed of or transferred for goods, wares or merchandise contrary to the spirit of this agreement.’ Now, throwing over these stipulations a mantle of charity broad enough to cover a multitude of sins and with a web thick and dense enough to conceal from our sight their otherwise obvious intention, what is their tendency, and what would be their probable practical operation?”
Showing its inevitable tendency was to injure all the employes and foster a monopoly, the judge continues:
“Having thus, in the most moderate colors which my estimate of the character and tendency of this store contract permits, endeavored to depict one of its characteristic features, I place it side by side with the time-honored principles announced by Chief Justice Wilmot, and submit it to the ordeal of those principles: ‘ Whatsoever a man may lawfully forbear, that he may oblige himself against; except where a third, person is wronged, or the public is prejudiced by it.’ It is the duty of all courts of justice to keep their eye steadily upon the interests of the public, even in the administration of commutative justice; and when they find *611 an action is founded upon a claim injurious to the public and which has a bad tendency, to give it no countenance or assistance in foro civili”
In the case of the Central Ohio Salt Company v. Guthrie, 35 Ohio St. 666, a contract had been entered into between the manufacturers and dealers in salt in the Muskingum and ITocking valleys, forming a combination or syndicate to control the market and keep up thereby the price of salt; that all salt on being manufactured should become the property of the syndicate, which was to have the sole right to transport and sell salt manufactured by all the members, and that these several members could only sell salt at their manufactories at retail, and at prices prescribed by the syndicate; and this court held that such an agreement was contrary to public policy because in restraint of trade, and void. Mcllvaine, C. J., said :
“ The clear tendency of such an agreement is to establish a monopoly, and to destroy competition in trade, and for that reason, on grounds of public policy, courts will not aid in its enforcement. It is no answer to say that competition in the salt trade was not in fact destroyed, or that the price of the commodity was not unreasonably advanced. Courts will not stop to inquire as to the degree of injury inflicted upon the public; it is enough to know that the inevitable tendency of such contracts is injurious to the public.”
Now let us look into this contract between defendant and the Standard Oil Company, and see just what it is as shown by the pleadings and findings in the case, and its aim and purpose as shown by the subsequent acts of the parties to it. Defendant having tariff rates for the public generally, in 1875, contracted with the Standard Oil Company that, in consideration of the company giving to the defendant its entire freight business in the products of petroleum, they would transport such freights for the company at certain rates dependent upon the fluctuation of the rates, but about ten cents per barrel cheaper than for any other customers; and the defendant not only agreed and undertook to carry for the company at the reduced *612 rate, but also that they would not ship for any others at less than the full tariff rate, and if they did it was understood that the Standard Oil Company would take from the defendant all its business, and deprive it of all its patronage. The understanding was to keep the price down foir the favored customer, but up for all others, and the inevitable tendency and effect of this contract was, to enable the Standard Oil Company to establish and maintain an overshadowing monopoly, to ruin all other operators and drive them out of business in all the region supplied by the defendant’s road, its branches, and connecting lines. The active participation of the defendant, in the unlawful purposes of the Standard Oil Company, is shown by the sequel. In 1883, the road of the N. Y., C. & St. L. R; Co. was constructed. It might become an active competitor for this business of transporting petroleum for customers other than the Standard Oil Company. It might establish such a tariff of rates that other operators in oil might successfully compete with the Standard Oil Company. If, however, the contract of 1875 was in force, the defendant had an exclusive right to all the freights of that company. Having that exclusive righ t to do all the carrying for the company, the district court found, “ that for the purpose of effectually securing at least the greater part of said trade, the defendant on the completion of the N. Y., C. & St. L. Railway, a competing line from Cleveland to the west, in the year 1883, entered into a traffic arrangement with it giving to it a portion of the shipments of said Standard Oil Company west, on a condition of its uniting with it in carrying out of such understanding as to reduced rates to said Standard Company, which arrangements still exist.” How peculiar. The defendant by a contract made in 1875 was entitled to all the freights of the Standard Oil Company, and yet say the district court, “for the purpose of securing the greater part of said trade,” they entered into a contract to divide ■with the new railroad, if the latter would only help to keep the rates down for the Standard and up for everybody else.
*613 Such a contract so carried out was, in the opinion of this court, not only contrary to a sound public policy, but to the lax demands of the commercial honesty and ordinary methods of business.
Defendant’s counsel in his brief affirms: “We do not believe a railroad company should act unjustly; that it should favor one man more than another; that it should favor one place more than another place, or that it should crush out one person for the purpose of advancing the fortunes of another.” We affirm that admitted doctrine, and upon it declare that contract void.
The cases before referred to, New England Express Company v. Maine Central Railroad Company, Sandford v. Railroad Company, Messenger v. Pennsylvania Co., all enforce and emphasize the doctrine that prevents the defendant from in any way intrenching itself behind its arrangement with the Standard Oil Company. Neither of the parties to it can enforce its terms against the other. It is void in law, and a void thing is no thing.
Neither does the fact found by the district court, that the contract “ was not made or continued with any intention on the part of the defendant to injure the plaintiffs in any manner,” make any difference in the case. The plaintiffs were not doing business in 1875, when the contract was entered into, and of course it was not made to injure them in particular. If a man rides a dangerous horse into a crowd of people, or discharges loaded fire-arms .among them, he might, with the same propriety, select the man he injures, and say he had no intention of wounding him. And yet the law holds him to have intended the probable consequences of his unlawful act as fully as if purposely directed against the innocent victim, and punishes him accordingly. And this contract, made to build up a monopoly for the Standard Oil Company and drive its competitors from the field, is just as unlawful as if its provisions had been aimed directly against the interests of the plaintiffs.
The effect of the provisions of the Ohio statutes upon *614 the ease at bar, do not seem to have been much relied on by plaintiff’s counsel. I think they can, at least, be looked to as indicative of the tendency and direction of the legislative policy of the state upon the questions we áre investigating.
“ Sec. 3366. Every company whose line of road extends to any place in the vicinity of, or to a point of intersection with, any of the navigable canals or other works of internal' improvement belonging to the state, shall fix and establish a tariff of rates for the transportation of merchandise, produce, and other property consigned to or from such place or point of intersection, and shall not charge or receive any higher rate for transporting similar merchandise, produce, or property, over a shorter distance of its road, than is charged or received according to such fixed tariff for transportation to and from such place of intersection.
“ Sec. 3367. Every such company shall publish its tariff of rates so established, on property consigned to and from such places or points of intersection, and cause the same to be kept conspicuously posted at the several business stations on its road ; no such company, its officers or agents, shall charge or receive, directly or indirectly, for transporting any pi-operty consigned as-aforesaid, any less rate than is designated on such printed card, until such rate is changed by an order of the board of directors of such company, and at least ten days’ notice of such change given by bill or card, to be posted as aforesaid ; and no such company, its officers or agents, shall evade, or attempt to evade, by drawback, free warehousing, or in any other manner, the payment of full freightage, according to the printed tariff of rates, as herein provided.
“Sec. 3373. No company or person owning, controlling, or operating a railroad, in whole or in part, within this state, shall charge or receive for transportation of freight for any distance within this state a larger sum than is charged by the same company or person for the transportation, in the same direction, of freight of the same class or kind, for an equal or greater distance over the same railroad and connecting *615 lines of railroad; and every such company or person who violates, or permits to be violated, the provisions of this section, shall forfeit and pay to the party aggrieved a sum equal to double the amount of the overcharge, but in no ease less than twenty-five dollars, and shall, also, for every unlawful act, forfeit and pay to the state a penalty of not less than one hundred nor more than one thousand dollars, to be recovered in a civil action, brought in the name of the state, by the prosecuting attorney of the county wherein such offense was committed, as part of his official duties, whenever complaint is made to him, and he is satisfied that the provisions of this section have been violated.”
If the unlawful acts of discrimination in freight charges complained of in this case come within the inhibition of these statutes, nothing need be proven beyond the acts, and it need not be shown that the acts themselves were injuious to the plaintiffs.
In the case of the Great Western Ry. Company v. Sutton, 4 Eng. and Ir. App. 226, the court, discussing the different modes of proof between a case under the “equality clause” and at common law, say :
“ The mode of establishing that the demand is extortionate differs in the two cases. Where it is sought to prove that the charge is unreasonable, and therefore extortionate, the fact that another was charged less is only material as evidence for the jury tending to prove that the reasonable charge was the smaller one. When it is sought to show that the charge is extortionate, as being contrary to the statutable obligation to charge equally, it is immaterial whether the charge is reasonable or not, it is enough to show that the company carried for some other person or class of persons at a lower charge during the period throughout which the party complaining was charged more under the like circumstances.”
'; How does an arrangement that compels plaintiff to pay sixty cents per barrel from Cleveland to Chicago, while the Standard Oil Company pays only fifty cents for transport *616 ing exactly the same article over exactly the same distance comport with the “ equality clauses ” of these statutes ?
We take notice that defendant’s railroad intersects the Ohio Canal at Cleveland, and the statute says the defendant must establish its tariff rates, and shall not charge or receive of any one less than the published rates. Plaintiffs complain not so much of the amount they have to pay, as the injury they suffer in the violation of law by the unjust discrimination in favor of their rival. My associates do not, perhaps, agree with me fully, but for myself I' think the ban of illegality is impressed upon the arrangement complained of by the provisions of our statute, and for that reason also the same is illegal and void.
The defendant in this case relies for its defense, not only upon the doctrine so frequently found in the books declaring that common carriers are to be held to a reasonable compensation, but not necessarily an equal compensation, but particularly on the cases of Johnson v. The Pensacola and Perdido R. Co., 16 Fla., 623, and Ex parte Benson, 18 S. C. 38.
In the latter case a petition was filed against the receiver of a railroad to compel him to pay to a shipper out of the “receiver’s fund” an amount that had been promised as a drawback to procure his custom as a cotton shipper. The receiver contested the claim on the ground that the discrimination was unlawful, but no person was shown to have been injured by, and no third person was complaining of the discrimination. Under that state of facts the shipper had judgment for his drawback.
In the Elorida case the discrimination was made in favor of a shipper of lumber who under peculiar circumstances had furnished the railroad company a sum of money to complete its road and was to have the loan repaid by freight at a reduced rate. Complaints of loss and injury were made by another shipper, but there was no proof or no satisfactory evidence to show the complaining shipper was injured in his business by the lower rate given to the other shipper. In both these cases reliance is placed on the doc *617 trine that discrimination is not necessarily unlawful, and that all the freighter is entitled to is a reasonable rate not necessarily equal to all; and in the absence of any statute to the contrary, we are not inclined to question the correctness of these decisions. But if we should regard them as contrary to the doctrine we have indorsed, we would only say they would thus be overcome by an overwhelming weight of authority.
I think, however, that all the cases that have been referred to, on their facts, might be harmonized by observing the distinction so often alluded to, that is to say, that as between a consignor and the common carrier, where no other reason intervenes to engraft an exception on the rule, all the consignor can demand of the common carrier is, that his goods shall be carried at a reasonable rate, not necessarily at an equal rate with all others. But when the re^" duced rate is either intended to, or has a natural tendency to injure the plaintiff in his business and destroy his trade, then a necessary exception is engrafted on the more general rule, and the plaintiff has then the right to insist that rates I to all be made the same for goods shipped “ under like cir-1 cumstances.” We can, perhaps, fully agree with defend-! ant’s counsel, and with what he says in his brief:
“ The important point to every freighter is that the charge shall be reasonable, and a right of action will not exist in favor of any one, unless it be shown that unreasonable inequality has been made to his detriment.”
In the Florida case, supra, the court say, “ most of the cases treat the common law rule strictly as between the parties, and without comparison as to the charges against others.”
The double aspect in which a case of discrimination is to be viewed, is well stated in the case of St. L., A. & T. H. R. Co. v. Hill, 14 Bradwell, 579, by Baker, J.: “ The statement, one is a common carrier, ex vi termini, imports a duty to the public, and a corresponding legal right in the public ; a right common to all. One of the duties imposed upon the common carrier is, that he is bound to carry for a reason *618 able remuneration, and is not allowed to make unreasonable and excessive charges. He can not, like a merchant or mechanic, consult his pleasure or caprice in the conduct of his business, and can not even by special agreement, receive an excessive and extortionate price for his services. Another duty imposed on him is to make no unjust, injurious, or arbitrary discriminations between individuals in his dealings with the public. The right to the transportation services of the carrier is a common right belonging to every one alike.’j/’ T
Of a like tenor and effect is Ragan v. Aiken, supra, where the question as to statutory regulation and the rules of the common law were before the court. The railroad company, or its manager, to induce parties doing business in a particular locality, and who could send by a different route, offered to carry their goods for fifteen cents per one hundred. They accepted the proposition and shipped accordingly. The complainants were charged more, as were the balance of the public along the line of the road. They charged that this discrimination was illegal, and as in this case, prayed an injunction. The court say, page 617 : “ Railroad companies, as quasi public corporations, exercising franchises granted in consideration of accommodations afforded the public, are required, and may be compelled by the courts to afford reasonable and impartial facilities of transportation. Their charges, when not regulated by charter or by statute, must be reasonable, and the courts will determine whether their charges are reasonable: Munn v. Illinois, 94 U. S. 118, 133; Chicago v. Iowa, 94 U. S. 155 ; Reg. v. Grand Junction Co., 4 A. & El. 16. If only a maximum limit of charge be fixed by charter, the reasonableness of other charge within the limit may be tested in the courts. If the charge for each service be fixed by law, or if the intention of the legislature in clear to only allow certain specified fares or tolls, leaving other cases unprovided for, the company must abide by its contract.”
The court further say, “ the question is, whether defend *619 ant can make such contract under the circumstances,” and decide as follows:
“ The English authorities hold that at common law, the common carrier is not bound to carry at equal rates for all customers in like condition. The authorites are collected in McDuffee v. Portland & Rochester Railroad, 52 N. H. 430, and in 3 Am. & Eng. R. Cas. 602. In this country the courts have generally held otherwise, and that statutes prohibiting discrimination are merely declaratory of the common law. Sinking Fund Cases, 99 U. S. 719; Messenger v. Pennsylvania Railroad Company, 36 N. J. Law, 407, 531. Discrimination in rates of freight, if fair and reasonable, and founded on grounds consistent with public interest, are allowable. Hersh v. Northern, etc., R. Co., 74 Pa. St. 181; Chicago, etc., R. Co. v. People, 67 Ill. 11; Fitchburg R. Co. v. Gage, 12 Gray, 393. The important point to every freighter is that the charge shall be reasonable, and a right of action will not exist in favor of any one unless it be shown that unreasonable inequality had been made to his detriment. A reasonable price paid by such a party is not made unreasonable by a less price paid by others. Or, as said by Crompton, J., to the plaintiff, upon the trial of such a suit: ‘ The charging another party too little is not charging you too much.’ Garten v. B. & E. Railroad Co., 1 B. & S. 112, 154, 165; McDuffee v. Portland & Rochester Railroad, supra. In determining whether a company has given undue preference to a particular person, the court may look to the interests of the company. Ransome v. Eastern Counties Railway, 1 C. B. N. S. 437; 1 Ib. 135.
“ In other words, if the charge on the goods of the party complaining is reasonable, and such as the company would be required to adhere to, as to all persons in like condition, it may, nevertheless, lower the charge of another person, if it be to the advantage of the company, not inconsistent with the public interest, and based on a sufficient reason. It is obvious that the intention of the defendant, in this instance, was not to discriminate against the complainants in favor oí any person of the same place, and in the same *620 condition. His object was to get business for his road from persons at a distance from its terminus, which otherwise would reach their destination by a different route. Under these circumstances, we can not see that the contracts complained of are against public policy, or that the complainants have been damaged, if the charges on their goods were reasonable.”
The doctrine here formulated will, in my opinion, reconcile all the cases upon their facts (though not perhaps all the judges have said in them), and make them consistent.
The question further presented is, if the plaintiffs have a right to relief, can they come into a court of equity and obtain it by the extraordinary remedy of injuction ; and a further question is proposed by the district court, whether section 3373 of the Revised Statutes was intended to apply to cases like the present, and if so, whether under it there is any authority for the relief by injunction. "Waiving the first question for the present, we affirm the law to be that if the right of the plaintiffs existed at common law to relief by injunction, the enactment of section 3873, if that section applies to the case at all, affords only a cumulative remedy, and that such a remedy by statute would in no wise take away the remedy at common law.
So, independent of the statute, we proceed to inquire whether the plaintiff has a remedy by injunction. In the cases of Sandford v. Railroad Company, supra, and The C. & A. R. Co. v. The People ex rel., supra, relief was sought and afforded by injunction.
In the case of McDuffee v. Railroad, supra, the court say, p. 451: “ There might be cases where the discrimination would be injurious; in such cases it would be actionable. There might be cases where the remedy by civil suit for damages at common law would be practically ineffectual, on account of the difficulty of proving large damages, or the incompetence of a multiplicity of such suits to abate a continued grievance, or for other reasons; in such cases there would be a plain and adequate remedy, where there ought to be one, by the re-enforcing operation of an *621 injunction, or by indictment, information, or other common, familiar, and appropriate course of law.” See also Pomeroy’s Eq., vol. 1, pp. 254, 255; 31 N. Y. 239; 54 N. Y. 159 ; 17 Mich. 238.
"We think the authorities abundantly show that in a case like the one at bar the plaintiffs can seek relief by injunction, and that it is an appropriate method to determine the rights of the parties here without first resorting to an action at law. The plaintiffs have a manufacturing capacity of 150,000 barrels per year. Shall they be compelled to bring a separate action for each car-load ? What number of suits would it require? Are the damages of plaintiffs for loss of profits susceptible of easy proof, or even capable of any exact estimation? We think the plaintiffs have a clear and undoubted right to come into a court of equity and have the rights of the parties determined in a single action.
A further question is presented, whether the decree for plaintiffs should be limited to and enforced only in this state, or shall it extend to and be enforced against the defendant at all points reached by defendant’s railroad, its branches, and connecting liues? The district court finds that the defendant .is a consolidated company, its lines of road extending from Buffalo to Chicago, and extending to various points in Pennsylvania, New York, Ohio, Indiana, Michigan, and Illinois. It is an artificial person, and the same person in all this territory, and this court has acquired jurisdiction of the person of the corporation, and the right to enforce all proper orders against it.
A similar question was determined by the supreme court of New Hamshire in McDuffee v. The Portland and Rochester R. Co., supra.
That was an action brought in the courts of New Hampshire for an unreasonable discrimination practiced on that part of the railroad situate in the state of Maine, and on demurrer it was claimed the action could not be sustained, because the acts complained of happened in the state of Maine. Upon this part of the ease the court say:
*622 “A part of the defendant’s road is in Maine and a part in New Hampshire. The defendants are, for ordinary practical purposes, one and the same corporation in each state, and are under the same common law obligations in each state. We know not how any individuals or corporations of New Hampshire can be aggrieved, in such cases as this, if the common law of both states is administered to them by the tribunals of Maine. Ifitwas the opinion of the legislature or the judiciary of Maine that we ought not to take jurisdiction of the plaintiffs complaint of an unreasonable discrimination made by the defendants against the plaintiffs, on that part of the road situated in Maine, we should endeavor to give no just cause of offense, and to avoid all jurisdictional conflict. And, if it should be found that we had unwittingly encroached upon the sovereignty of another state, we should make haste to retrace our steps. But, as we understand the law of Maine, we are safe in holding that we may take jurisdiction of the whole of the case presented by the plaintiff, in an action at common law. Undoubtedly, on the question of discrimination practiced by the defendants in the performance of their duty in Maine, the rights of the parties are to be determined according to the law of that state. But, with the present system of continuous common carriage among our numerous states, if the remedy were cut in pieces by every state line, in'cases of this kind, the evil consequences would be serious, and, as we think, without any legal necessity. Considering this point upon the general doctrine of transitory actions, the generally uniform liability of natural and artificial persons, and the intent of the legislatures of Maine and New Hampshire to create a corporation that might act, and be dealt with, as one and not two, in such matters as those involved in this suit, we see no room for doubt,” quoting a number of authorities.
The railroad is an entirety, whether within the state or without, and the artificial person, by the acts of the several states authorizing consolidation, has been created one, and not two or more; and no reason is perceived why it may *623 not be dealt with by the courts of either state that has procured jurisdiction.
This artificial person not only holds itself out, but does make contracts for the transportation of freight over its connecting lines as well as its own line, and it makes rates to points only reached by connecting lines. No reason is perceived why it should not be ordered to make no discriminations to the injury of plaintiff's in its rates to points thus reached. Of course it may at any time refuse to make any rates beyond its own lines, but if it makes rates to points on connecting lines, the rates should be equal to all. The order of the court is that the defendant be restrained, as prayed for in plaintiff’s petition.

Judgment accordingly.